## THE MINNESOTA LUMBER COMPANY

### *v.*

## THE WHITEBREAST COAL COMPANY.

*Filed at Ottawa October 11, 1895—Rehearing denied March 13, 1896.*

1. CONTRACTS—*when contract is not void for want of mutuality.* A contract by a lumber company for its "requirements" of coal for a certain season is not void for uncertainty and want of mutuality, when it was meant to call for the amount of coal which the corporation should need in its business for such season, and not merely what it might choose to require of the other party.

2. SAME—*interpretation—two meanings.* Where a contract is susceptible of two interpretations that will be adopted which will give the contract operation.

3. SAME—*what is not an option contract.* A contract for the privilege of ordering any quantity of coal not exceeding 12,000 tons, made as a modification of a prior disputed contract, with the intention of limiting the quantity of coal to be ordered without relieving the purchaser from the prior agreement, is not illegal, as being an option contract, within the statute.

*Minn. Lumber Co.* v. *Whitebreast Coal Co.* 56 Ill. App. 248, reversed.

160    85
82a  293

160     85
f92a  ²248

160     85
90a  ¹164
91a  ²503

160     85
d94a  ¹    9

160     85
f98a  ¹642
98a  ³643

160     85
193   ²135

160     85
200   ¹346

160     85
110a   525

160     85
211   ³233

160     85
212    162
212    163
214   ³596

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of DeKalb county; the Hon. HENRY B. WILLIS, Judge, presiding.

This is an action of assumpsit brought by appellee against appellant. The declaration consists of the common counts only. The bill of particulars is an account for coal aggregating $19,739.97 at the price per ton named in the contract hereinafter set forth, upon which amount are credited payments and freight credits aggregating $10,485.61, leaving balance, claimed to be due, of $9254.36. The pleas were the general issue, and the two special pleas of set-off hereinafter set out. Demurrers were filed to the two special pleas and sustained by the circuit court. The defendant elected to stand by its special pleas. A jury was then waived by agreement, and the cause was submitted to the court for trial without a jury. The findings were in favor of the plaintiff, and judgment was rendered in its behalf for said balance of $9254.36. The Appellate Court has affirmed the judgment, and the present appeal is prosecuted from such judgment of affirmance.

The second plea, or first special plea, alleges, that plaintiff is indebted to defendant for damage because of its neglect and refusal to deliver to defendant coal, according to the contract of plaintiff with defendant, dated August 4, 1886, in words and figures as follows:

"POLO, ILL., *Aug. 4, 1886.*

"Memorandum of contract between the Whitebreast Coal Company, by S. G. Russell, agent, and Minnesota Lumber Company: The said Minnesota Lumber Company agrees to buy its requirements of anthracite coal for season of 1886-1887 (upon condition named hereafter) of said Whitebreast Coal Company, which is to furnish the same as ordered (best quality of Scranton coal), at following prices f. o. b. cars at Milwaukee or Chicago, at

option of said M. L. Co., to-wit: $4.35 per ton for egg and grate, and $4.60 for stove and nut up to November 1, after which time said prices shall be advanced five cents per ton for the remaining term of this contract.   Other sizes at proportionate prices.   Payments on shipments to be settled on 15th of each month following shipment, in a sixty day acceptance of said M. L. Co., without interest. In the event of lower prices than the above on standard anthracite coal being offered said M. L. Co., the said Whitebreast Coal Company agrees either to accept such lower prices on balance of coal not shipped or release said M. L. Co. from further liability on this contract. It is further agreed that the prices last herein made shall apply to orders up to January 1, 1887.   It is agreed that this contract shall be binding on both parties, provided the said M. L. Co. shall confirm the same by telegraph any time during this or the following day.

WHITEBREAST COAL CO.,

By S. G. RUSSELL, *Sales Agent.*

MINNESOTA LUMBER CO.,

By GEO. W. PERKINS, *Sec'y.*"

That defendant's requirements of anthracite coal for the season between the dates of August 5, 1886, and January 1, 1887, were twenty-five thousand tons, and that it did confirm said contract by telegraph during the day following the making of said contract; that, in pursuance of said contract, it did order a large quantity of said coal to be shipped in cars from Milwaukee and from Chicago; that plaintiff failed and neglected to fill any of said orders, although defendant avers that it was ready, willing and able, and offered, at all times to fulfill its part of the contract, whereby damage accrued to defendant, to-wit, said sum of $25,000; that at and before the making of said contract defendant was extensively engaged in the purchase, use and sale of anthracite coal in the ordinary course of its business, and that its requirements for such coal, in the ordinary course of its business, for

the season of 1886 and 1887, were a very large amount, to-wit, the amount of fifty thousand tons, all of which was well known by plaintiff.

The third plea, or second special plea, alleges, that plaintiff is indebted to defendant for damage because of the neglect and refusal of plaintiff to deliver to defendant a large quantity, to-wit, ten thousand tons of coal, according to the contract of plaintiff with defendant, which contract, dated August 4, 1886, and the modification thereof dated August 21, 1886, are in words and figures as follows, to-wit: (Here follows, *verbatim et literatim*, the contract of August 4, 1886, as the same is above set out in the second plea). After so setting out the contract of August 4, 1886, the third plea proceeds to give the modification thereof as made on August 21, 1886, in the words and figures following, to-wit:

"Whereas, a dispute has arisen between the parties to the within instrument, it being claimed by the Whitebreast Coal Company that the said instrument does not constitute a valid engagement upon their part to furnish coal, which claim is denied by the said Minnesota Lumber Company:

"Now, therefore, in order to arrive at an amicable settlement of the dispute pending, it is mutually agreed by the said Whitebreast Coal Company and the Minnesota Lumber Company that the said alleged contract shall be performed upon the following conditions and exceptions: Coal shall be billed and paid for at the rate of $4.45 per ton for egg and grate and $4.70 for stove and nut and No. 4. As soon as convenient hereafter, each of the parties hereto shall choose an arbitrator, they to choose a third, which three arbitrators, upon a hearing of the respective claims of each of the parties, shall decide whether the Minnesota Lumber Company is entitled to its coal at the prices named in the within alleged contract of August 4. In case of an affirmative decision of this question, the Whitebreast Coal Company shall re-

bate to said Minnesota Lumber Company the difference between said contract prices and the amended prices mentioned herein; in case of a negative decision, the said amended prices shall be in final settlement of the coal. It is agreed that the coal shall be settled for in sixty days' paper, as before mentioned, and it shall also be decided by said arbitrators whether the paper shall be with or without interest. It is agreed that this arbitration shall be made under the statute of the State of Illinois. It is agreed that the Whitebreast Coal Company shall pay the Minnesota Lumber Company the difference between the prices fixed by arbitration and the cost price upon all coal ordered by the Minnesota Lumber Company between August 4, 1886, and the date hereof. It is also agreed that the Minnesota Lumber Company shall have the privilege, under this contract, of ordering any quantity of coal not in excess of twelve thousand tons, which agreement is in lieu of stipulation for requirements,—this amount of coal ordered between August 4 and date not to exceed two hundred tons. It is distinctly understood and agreed that neither party hereto waives any of the respective rights heretofore claimed.

"POLO, ILL., *August 21, 1886.*

MINNESOTA LUMBER COMPANY,

By GEO. W. PERKINS, *Sec.*

WHITEBREAST COAL COMPANY,

By C. K. PITTMAN, *Gen. Agt.*"

The plea further averred, that the sole and only cause of action in plaintiff's declaration is for the price of coal delivered in part performance of said contract; that the modification dated August 21, 1886, was made and assented to by defendant at the request of plaintiff, and for the purpose of limiting and restricting defendant to the amount of twelve thousand tons of coal which it should have, and had, the right to purchase under said contract, as amended, for the season of 1886 and 1887; that plaintiff, after having delivered a small portion of

the coal contracted to be delivered by said contract, to-wit, two thousand tons, neglected and refused to ship and deliver to defendant the balance of the said twelve thousand tons upon the order and request of defendant, although defendant was at all times ready, willing and able to, and did, keep and perform the terms of said contract on its part; that it did at divers times request plaintiff to deliver the balance of said twelve thousand tons according to said contract, which plaintiff neglected and refused to do, whereby damage accrued to defendant, to-wit, said sum of $25,000; that at and before the making of said contracts defendant was extensively engaged in the purchase, use and sale of anthracite coal in the ordinary course of its business, and that its requirements for such coal in the ordinary course of its business for the season of 1886 and 1887 were a very large amount, to-wit, the amount of fifty thousand tons, all of which was well known by plaintiff at the time of making said contracts.

Both pleas tender set-off of the alleged damages, and pray judgment.

JNO. P. WILSON, and CARNES & DUNTON, for appellant:

When the meaning of a contract is doubtful, or susceptible of two senses, that construction is to be adopted which will give effect to the intent, as a legal contract, rather than that which will render it inoperative. *Thrall* v. *Newell*, 19 Vt. 202; Chitty on Contracts, 79, 80.

The letter of a contract is sometimes restrained, sometimes enlarged, and sometimes the construction is contrary to the letter. 4 Bacon, title "Statute," secs. 38, 45, 50.

A statute should be construed with reference to its object, and the will of the law-makers is best promoted by such a construction as secures that object and excludes every other. *Castner* v. *Walrod*, 83 Ill. 178; *Hamilton* v. *State*, 102 id. 367; *People* v. *Hoffman*, 97 id. 234; *Cruse* v. *Aden*, 127 id. 239; *Perry County* v. *Jefferson County*, 94 id. 214.

WILLIAM BARGE, for appellee:

It is clear that appellant never intended any definite quantity should be fixed by the agreement, but that the amount should be determined by its own discretion. This uncertainty is a patent ambiguity, and cannot be affected by extraneous evidence. 2 Wharton on Evidence, sec. 957.

Extrinsic evidence is not admissible to remove a patent ambiguity. 1 Am. & Eng. Ency. of Law, 529.

A patent ambiguity is an ambiguity which arises upon the words of the instrument as looked at in themselves, and before they are attempted to be applied to the object or to the subject which they describe. 1 Am. & Eng. Ency. of Law, 527.

The agreement does not bind appellant to require any coal, and is, therefore, void for want of mutuality. This is settled by the case of *Bailey* v. *Austrian*, 19 Minn. 535.

One promise may be a good consideration for another promise, but not unless there is an absolute mutuality of engagement, so that each party has the right at once to hold the other to a positive agreement. 1 Parsons on Contracts, (3d ed.) 374; *McKinley* v. *Watkins*, 13 Ill. 140.

If there is one entire consideration for two several contracts, and one of these contracts is for the performance of 'an illegal act, the whole is void. 1 Addison on Contracts, (Morgan's ed.) p. 439, sec. 300; *Hopkins* v. *Prescott*, 4 C. B. 578.

This privilege is only an option, and is most clearly so established by the case of *Schneider* v. *Turner*, 130 Ill. 28.

The contract, tested by the statute, is void, and therefore each count of the declaration is obnoxious to the demurrer interposed. *White* v. *Barber*, 123 U. S. 392; *Osgood* v. *Bander*, 75 Iowa, 550; *Webster* v. *Sturges*, 7 Ill. App. 560; *Wolcott* v. *Heath*, 78 Ill. 433; *Pickering* v. *Cease*, 79 id. 328; *Pixley* v. *Boynton*, id. 351; *Miller* v. *Bensley*, 20 Ill. App. 528; *Tenney* v. *Foote*, 4 id. 394; *Pearce* v. *Foote*, 113 Ill. 228; *Lyon* v. *Culbertson*, 83 id. 33; *Gilbert* v. *Guager*, 8 Biss. 214.

The test is, whether the case or defense is made out through the aid of the illegal contract. If so, it must fail. *Taylor* v. *Chester*, L. R. 4 Q. B. 309 ; 2 Benjamin on Sales, sec. 788, p. 681; *Gilliam* v. *Brown*, 43 Miss. 641; *Roby* v. *West*, 4 N. H. 290 ; *Welsh* v. *Wesson*, 6 Gray, 505 ; *Phalen* v. *Clark*, 19 Conn. 421; *Woodworth* v. *Bennett*, 43 N. Y. 275; *Armstrong* v. *Bank*, 133 U. S. 433; *Roberts* v. *Roberts*, 2 B. & A. 367.

The test of whether a demand connected with an illegal transaction can be enforced at law, is, whether the plaintiff requires the aid of the illegal transaction to establish his case.  *Swan* v. *Scott*, 11 S. & R. 155; *Thomas* v. *Brady*, 10 Pa. St. 164; *Scott* v. *Duffy*, 14 id. 18; *Columbia Bridge Co.* v. *Haldeman*, 7 W. & S. 233; *Walt* v. *Green*, 73 Pa. St. 198.

WILLIAM McNETT, also for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court :

The first point discussed by counsel on both sides is whether the trial court erred in sustaining the demurrer to the second plea, which sets up the contract of August 4, 1886. It is insisted by appellee, that the demurrer to that plea was properly sustained upon the alleged ground, that the contract of August 4 was void for uncertainty and for want of mutuality.

After a careful consideration of the terms of the contract, we do not think that it can be regarded as void for the reasons stated.

It is said by counsel for appellee, that the amount or quantity of appellant's "requirements" of anthracite coal for the season of 1886-1887 is not fixed by the contract, and that, for this reason, it is wanting in certainty; and that the contract does not bind appellant to "require" any coal, and, for this reason, is wanting in mutuality.

Contracts should be construed in the light of the circumstances surrounding the parties, and of the objects which they evidently had in view. The circumstances,

which both parties had in view at the time of making the contract, may be referred to for the purpose of determining the meaning of doubtful expressions. Courts will seek to discover and give effect to the intention of the parties, so that performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and greater regard is to be had to their clear intent than to any particular words which they may have used to express it. (*Doyle* v. *Teas*, 4 Scam. 202; *Torrence* v. *Shedd*, 156 Ill. 194). The parties, representing the companies who entered into the contract of August 4, 1886, were practical business men. The word, "requirements," as used by them, evidently meant the amount or quantity of coal, which appellant would need in its business for the specified season. Appellant agreed to buy such anthracite coal, as it should need in its business for the season of 1886-1887, of appellee at a certain price per ton, and appellee agreed to furnish said amount of coal, free on board the cars at Chicago or Milwaukee, at said price per ton, as it should be ordered by appellant during said season.

The plea avers, that defendant was engaged in the purchase, use and sale of coal in its business, and that its requirements therein for that season were very large, and that such fact was well known to the plaintiff. The parties will be presumed to have contracted with reference to the knowledge which they then had upon that subject, and upon the supposition that appellant would need the same quantity of coal, which it had theretofore been in the habit of using. The word, "requirements," evidently has the same meaning as the word, "needs." The amount of coal, which was "required" for the business of that season, was the amount of coal, which was "needed" in the business of that season.

If the word, "requirements," as here used, is so interpreted as to mean that appellee was only to furnish such coal as appellant should require it to furnish, then it

might be said, that appellant was not bound to require any coal unless it chose, and that, therefore, there was a want of mutuality in the contract. But the rule is, that, where the terms of a contract are susceptible of two significations, that will be adopted which gives some operation to the contract, rather than that which renders it inoperative. (*Thrall* v. *Newell*, 19 Verm. 202; *Evans* v. *Saunders*, 8 Porter, 497). A contract should be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such construction is wholly negatived by the language used. (*Torrence* v. *Shedd*, *supra*). It cannot be said, that appellant was not bound by the contract. It had no right to purchase coal elsewhere for use in its business, unless, in case of a decline in the price, appellee should conclude to release it from further liability.

A contract, somewhat similar to the one now under consideration, came before this court for construction in *National Furnace Co.* v. *Keystone Manf. Co.* 110 Ill. 427. The following language there used is, with appropriate changes, applicable to the present case : "We do not regard the contract void on the ground stated. It is true that appellee was only bound by the contract to accept of appellant the amount of iron it needed for use in its business; but a reasonable construction must be placed upon this part of the contract, in view of the situation of the parties. Appellee was engaged in a large manufacturing business, necessarily using a large quantity of iron in the transaction of its business. It is not to be presumed that appellee would close its business and need no iron, but, on the contrary, the reasonable presumption would be that the business would be continued, and appellee would necessarily need the quantity of iron which it had been in the habit of using during previous years. It cannot be said that appellee was not bound by the contract. It had no right to purchase iron elsewhere for use in its business. If it had done so appellant might have

maintained an action for a breach of the contract. It was bound by the contract to take of appellant, at the price named, its entire supply of iron for the year,—that is, such a quantity of iron, in view of the situation and business of appellee, as was reasonably required and necessary in its manufacturing business. Such contracts are not unusual. A foundry may purchase its supply of coal for the season, of the coal dealer. A hotel may do the same. A city, for the use of the public schools, may engage its supply of coal for the winter at a specified price. Such contracts are not uncommon, and we have never understood that they were void. *Smith* v. *Morse*, 20 La. Ann. 220, is a case in point. In this case Smith agreed to furnish Morse all the ice he might require for the use of his hotel for five years, at a certain price. Smith undertook to avoid the contract, on the ground that Morse was not bound, but the court held the contract valid and binding on both parties."

For the reasons stated, we are inclined to think the demurrer to the second plea should have been overruled.

The second point discussed by counsel is, whether or not the contract of August 4, 1886, as changed by the modification of August 21, 1886, is in violation of section 130 of the Criminal Code of this State. That section provides, that "whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or other commodity, stock of any railroad or other company, or gold  *  *  *  shall be fined,  *  *  * and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." (1 Starr & Cur. Stat. p. 791). It is claimed by appellee, that the demurrer to the third plea was properly sustained upon the alleged ground, that the modified contract of August 21, 1886, as therein set out, is void as being a contract for an "option" within the meaning of section 130.

The modification of August 21, 1886, contains the following provision, to-wit: "It is also agreed, that the

Minnesota Lumber Company shall have the privilege
under this contract of ordering any quantity of coal not
in excess of twelve thousand tons, which agreement is in
lieu of stipulation for requirements."

If this provision stood alone, it might be said, with
some plausibility, that it was a mere contract for the
option to buy coal at a future time, and that, so, it came
within the meaning of section 130. But the provision must
be construed in connection with the rest of the agreement
of August 4, as modified by the amendment of August 21.
Language used in a contract should be so construed as
to give effect to the instrument as a legal agreement.
(*Thrall* v. *Newell, supra*). The intention of the parties, which
courts will seek to discover in giving construction to a
contract, is to be gathered, not from particular words and
phrases, but from the whole context of the agreement.
The supplemental contract of August 21 was entered into
for the purpose of settling a dispute, which had arisen
as to the validity of the contract of August 4. It was
not designed to supersede the latter contract, but to
modify it. It recites upon its face, "that the said alleged
contract shall be performed upon the following condi-
tions and exceptions." It made two changes. In the
first place, it increased the price of the coal ten cents
per ton over the price named in the old agreement. It
provided, that the coal should be billed and paid for at
this increased price, leaving it to be determined by arbi-
tration whether appellee should retain the benefit of such
advanced price, or should refund the same to appellant.
In the second place, it limited the amount of coal which
appellant was entitled to order to twelve thousand tons.
By the original agreement, appellant was entitled to
order all the coal which was required or needed in its
business for the season named; by the modified contract,
appellant was restricted to the privilege of ordering
twelve thousand tons. It was not the intention here to
contract for the mere option or privilege of buying coal

at a future time, but simply to limit the quantity to be bought. As, by the original contract, appellant had agreed to buy and appellee had agreed to sell and deliver, as ordered, all the coal which would be needed in the business for the season, so, by the modification, appellant agreed to buy and appellee agreed to sell and deliver, as ordered, an amount of coal not to exceed twelve thousand tons. The supplemental contract was not intended to relieve appellant from its obligations under the original contract, but simply to limit its rights thereunder; it was not intended to be an option contract, as it was not optional with defendant whether it should or should not perform the contract of August 4.

In *Pearce* v. *Foote*, 113 Ill. 228, we said (p. 234): "The true idea of an option is what are called, in the peculiar language of the dealers, 'puts' and 'calls.' A 'put' is defined to be the 'privilege of delivering or not delivering' the thing sold, and a 'call' is defined to be the 'privilege of calling for or not calling for' the thing bought. 'Optional contracts' in this sense are usually settled by adjusting market values, as the party having the 'option' may elect. It is simply a mode adopted for speculating in differences in market values of grain or other commodities. It must have been in this sense the term 'option' is used in the statute. Such a contract is obviously fictitious, having none of the elements of good faith as in a contract where both parties are bound, and is defined by statute as a 'gambling contract.'" It was said in *Tenney* v. *Foote*, 4 Bradw. 594, and approved on appeal in *Tenney* v. *Foote*, 95 Ill. 99: "In practice on the stock exchange it was often the intention of the parties that no stock should be delivered but the transaction settled upon differences. This became common, and the English statute was aimed at its repression, because it was, in effect, gambling. Our statute is directed against the same evil, and extends to transactions in grain and other commodities as well as stocks, so that the word 'option,' as used

in the statute here, taken with the context, means a mere choice, right or privilege of selling or buying; and it is the contracting for such choice, right or privilege of selling or buying, at a future time, any commodity, the statute was intended to prohibit, as contradistinguished from an actual sale or purchase with the intention of delivering and accepting the commodity specified." This extract from *Tenney* v. *Foote, supra,* was quoted with approval in *Schneider* v. *Turner,* 130 Ill. 28. In the recent case of *Preston* v. *Smith,* 156 Ill. 359, we said (p. 363): "In all the cases where a contract has been held void under the statute, it will be found either the option to deliver the subject of the contract remained with the vendor, or the option to accept the article remained with the purchaser."

If these definitions of an optional contract be applied to the contract of August 4 as amended by the modification of August 21, it will appear, that the latter contract does not come within the meaning of section 130 of the criminal law. It is the duty of courts to give a reasonable construction to the contracts of parties, and to effectuate their intention if possible. By no reasonable construction can it be said, that the modified agreement of August 21 was the contracting for a mere choice, right or privilege of selling or buying coal at a future time. The parties agree to make actual sales and purchases with the intention of delivering and accepting the coal. As an evidence of this, there occur such expressions as the following: "The said Minnesota Lumber Company agrees to buy * * * of said Whitebreast Coal Company, which is to furnish the same as ordered * * * at following prices." "Payments on shipments to be settled on 15th of each month following shipment in a sixty day acceptance." "It is agreed, that this contract shall be binding upon both parties." "It is mutually agreed * * * that the said alleged contract shall be performed." "Coal shall be billed and paid for at the

rate," etc.   "It is agreed, that the coal shall be settled for in sixty days' paper as before mentioned," etc.

Upon the trial before the court of the issue formed by the filing of the general issue, it appeared from the testimony, that appellee shipped to appellant about four hundred tons of the coal in September, sixteen hundred tons in October, eleven hundred tons in November and one thousand tons in December, or about four thousand tons in all, leaving about eight thousand tons, stipulated for in the contract and ordered by appellant, unshipped.

It follows from the foregoing considerations, that the demurrer to the third plea should have been overruled.

A third question is elaborately discussed in 'the arguments of counsel, and that relates to the right of appellee to recover for the value of the coal delivered, irrespective of the character of the contract upon which it was delivered, as to alleged uncertainty or want of mutuality therein.   That is to say, assuming that the modified contract of August 21 was illegal and criminal under said section 130, appellee insists, that, under the common counts put in issue by the plea of the general issue, it was only bound to show the orders of appellant for the coal, the shipments of the coal, and the value of the coal so shipped; that it was not necessary for it to prove the contract in order to recover the value of the coal; that, as the declaration is not upon the illegal contract, nor to enforce it, but to recover the value of coal sold and delivered, it was sufficient to establish a *prima facie* case without introducing the contract; and that, having established such *prima facie* case, its right to a recovery was not affected by the introduction of the illegal contract by the appellant, accompanied by proof that the coal was sold and delivered thereunder.   Appellee contends, in other words, that the test, as to whether a demand connected with an illegal transaction is capable of being enforced by law, is whether·the plaintiff requires the aid of the illegal transaction to establish his case.   On the

other hand, appellant claims that, if the contract is illegal and criminal, the maxim *in pari delicto* applies, no matter which party is the first to urge it upon the court; and that, whenever it appears that the property, whose value or price is sued for, was delivered under an illegal contract, whether it is so made to appear by the testimony of the plaintiff or the defendant, the plaintiff can not recover, upon the ground that in such case the court will aid neither party.

If the contract was illegal and criminal, then, under the contention of appellee upon this branch of the case, appellant would be obliged to pay for such of the coal as was actually delivered to it, without being allowed to show, as an offset, any damages suffered by it for the non-delivery of the balance of the coal. Upon the assumption of the illegality of the contract, appellant's contention would leave appellee without payment for the coal, which it parted with. The apparent injustice of either contention is obviated by the view already taken of the modified contract. As the contract is herein held to be valid, the plaintiff will be entitled, upon another trial, to recover for the coal delivered, except so far as the defendant may be able to show damages as aforesaid as an offset, either partial or entire, to the amount of coal received by it. Appellant will have the right to offset the damages, if it can prove any; but if it fails in such proof, appellee will recover the value of the coal delivered. In view of the disposition thus made of the special pleas, it is unnecessary to discuss the third question raised by counsel, and we pass no opinion upon it.

The judgments of the Appellate and circuit courts are reversed, and the cause is remanded to the circuit court for further proceedings in accordance with the views herein expressed.          *Reversed and remanded.*