## Hunter W. Finch & Company, Appellee, v. Zenith Furnace Company, Appellant.

### Gen. No. 14,110.

1. APPEALS AND ERRORS—*effect of failure to assign cross-errors.* A motion to strike a portion of a bill of exceptions, which motion has been presented to and been denied by the trial judge, is not preserved for review in the absence of an assignment of cross-error.

2. BILL OF EXCEPTIONS—*when motion sought to be preserved for*

*review not shown to have been overruled prior to term of present-ment of bill of exceptions.* Upon a motion to strike that matter contained in a bill of exceptions which refers to the action of the court in overruling a motion to dismiss made prior to the trial upon the ground that such motion was determined at a term prior to the term at which the bill of exceptions was presented and that no extension of time beyond such term had been provided for, it must clearly appear that such motion was in fact finally disposed of during the term preceding the presentment of the bill of exceptions, otherwise the motion to strike will be denied.

3.   CORPORATIONS—*act regulating admission of foreign corporations to do business in Illinois, construed.* A foreign corporation which has not complied with the act of May 18, 1905, entitled "An act to regulate the admission of foreign corporations for profit to do business in the State of Illinois," while incapable of maintaining actions in this state may none the less be lawfully sued in this state.

4.   CORPORATIONS—*right of domestic to sue foreign corporation in this state notwithstanding such domestic corporation has not complied with the laws of the state of the organization of such foreign corporation.* The principle of comity in Illinois does not go so far as to preclude domestic corporations from maintaining in this state a suit against a foreign corporation of another state in which other state such domestic corporation has done business without complying with the laws relating to foreign corporations. Inability of such domestic corporation to sue in such foreign state, does not affect the status thereof so to maintain actions in this state.

5.   CORPORATIONS—*when contract not void for failure of foreign corporation to comply with state regulations.* A contract made in good faith and partly executed which is not in its nature immoral is not void because of the failure of one of the parties (an Illinois corporation) to comply with the statutes of the state where such contract was made and to be performed which pertain to foreign corporations doing business in such state of performance. (So held with respect to the statutes of Minnesota.)

6.   CONTRACTS—*what not ultra vires.* A corporation organized for the purposes of "mining smelting, reducing, refining and working of iron ores and other minerals and the manufacture of iron, steel, copper and other metals," has necessarily implied power to purchase coal for such purposes and likewise has the power to contract to sell and deliver coal acquired by it.

7.   CONTRACTS—*rule of construction with respect to validity.* Where two constructions may be given to a contract one of which will give it validity and the other of which will render it invalid, the former will be adopted.

Hunter W. Finch & Co. v. Zenith Furnace Co., 146 App. 257.

8.   CONTRACTS—*when pro rata delivery of merchandise not justified.*   If one agrees to sell and (subject to intervening causes beyond his control) to deliver a commodity, it is not the law that upon a showing of such intervening causes preventing full delivery, a *pro rata* delivery may be made to the vendee, and others with whom contracts have been contemporaneously and subsequently made for like deliveries of such commodity.   Neither is it competent to prove a custom entitling such vendor so to do.

9.   SALES—*what contract of.*   Held, that the contract set forth in this opinion although ambiguous in form, was one of purchase and sale.

10.   DEFINITIONS—*"estimated."*   "Estimated" held the equivalent of "more or less."

11.   MEASURE OF DAMAGES—*in action for failure to deliver commodity as per contract.*   In an action by a vendee against a vendor for failure to make deliveries of coal pursuant to contract, the following instruction is held correctly to state the measure of damages:

"The court instructs the jury that the measure of damages in this case, if you shall find that the plaintiff is entitled to recover damages, is the difference, if any, between the market price of the coal mentioned in the contract offered in evidence herein and the contract price at the time or times the same should have been delivered."

Actual resales not being essential to recovery for coal not delivered.

Assumpsit.   Appeal from the Superior Court of Cook county; the Hon. SAMUEL C. STOUGH, Judge, presiding.   Heard in this court at the October term, 1907.   Affirmed.   Opinion filed January 18, 1909.

KNAPP, HAYNIE & CAMPBELL and MARK BREEDEN, JR., for appellant.

NICHOLAS W. HACKER, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

This is an appeal from a judgment of the Superior Court of Cook county for $10,200, in favor of the plaintiff corporation, Hunter W. Finch & Company (which is appellant here), against the defendant corporation, the Zenith Furnace Company (which is the

appellee in this court). It was entered on the verdict of a jury in an action in assumpsit for the breach of a contract hereinafter set out. The suit was begun by attachment, certain debtors of the defendant corporation being garnisheed. A bond and recognizance entered into thereafter by the defendant under the statutory provisions released the garnishees.

The declaration on which the case was tried set up in one of its three counts, *in haec verba,* and in the others, the effect and purport of, the following contract in writing:

"Coal Contract, made this 2nd day of May, 1905,
    Between:
        The Zenith Furnace Company of Duluth, Minnesota, party of the first part, and Hunter W. Finch & Company of Chicago, Illinois, party of the second part.

First party agrees to sell to the second party, who agrees to buy from the first party, estimated tonnage of Fifty Thousand (50,000) tons Ella Coal to be loaded at First Party's docks, this coal to be taken through the year ending March 31st, 1906, in as near monthly instalments as market conditions will permit, at the following prices: When the agreed selling price of Youghiogheny Lump Coal at the docks is Three Dollars ($3.00) a commission of ten cents (10c.) per ton is to be paid to second party and thereafter any premium obtained above three dollars ($3.00) for the coal is to be divided, three-fifths to the First Party and two-fifths to the Second Party. The coal is to be paid for at Western Weighing Association weights, not later than the 20th of the month following shipments.

Party of the first part is to screen this coal and prepare it in a good merchantable manner, suitable for the commercial trade, to make shipments promptly, and in every reasonable way to assist the Second Party in disposing of the above estimated tonnage.

This contract to be made subject to strikes, shortage of cars and other conditions beyond the control of parties hereto, it being understood that the cars are to be supplied by the First Party.

In witness whereof, the Parties hereto have hereunto set their hands and seals the day and year first above mentioned.

By ZENITH FURNACE COMPANY,

By A. B. WOLVIN,
President.

Signed, sealed and delivered in the presence of
L. G. FISHER.

By HUNTER W. FINCH & COMPANY,

By H. W. FINCH,
President.''

Each count then alleged that although the said time for the said delivery of the coal in said contract mentioned had long since elapsed, and the plaintiff had always been ready, able and willing to accept and receive the said coal and to pay for the same ''at the price aforesaid''; yet the defendant had not nor would within the time aforesaid, or afterward, deliver said coal or any part thereof to the plaintiff at the time and place aforesaid, or elsewhere, but had refused so to do. All of which it was alleged was of great damage to the plaintiff.

The defendant filed a plea of the general issue to the declaration and three special pleas, which we will name as Pleas 2, 3 and 4.

Plea 2 set up a failure on the part of the plaintiff, an Illinois corporation, to comply with the statutes of Minnesota requiring certain matters from foreign corporations doing business in Minnesota, on penalty of their being barred from maintaining in the courts of Minnesota any action for the enforcement of any contract, right, obligation or duty arising out of said business. It also set up the failure of the defendant, a corporation foreign to Illinois, to comply with the provisions of the statute of Illinois in regard to foreign corporations.

This plea was generally and specially demurred to by the plaintiff. The defendant confessed the demurrer.

Plea No. 3 was substantially the same as Plea No. 2 in its intendments. It also was demurred to generally and specially, and the demurrer was sustained by the court.

Plea No. 4 set up the same contract averred in the declaration as the only one made by the parties, and averred performance of the same by delivery to the plaintiff of ''all the coal that it was under obligation under its said contract with the plaintiff to deliver to the plaintiff.'' The plea further averred in detail that at the time of the making of the said contract and for a long time prior thereto it was engaged in buying and selling Ella coal at Duluth, Minnesota, and had a large number of contracts with divers persons, including the plaintiff, ''for the sale and delivery of said coal at Duluth''; that at no time during the period covered by the contract with the plaintiff did the amount or aggregate of all said contracts equal or exceed the capacity of defendant's equipment to fill said contracts; that on the contrary at all times the defendant was, so far as the capacity of its works and equipment was concerned, amply provided with funds and facilities to fill all said contracts, and had made contracts for the delivery to it at Duluth of an ample supply of Ella coal for the purpose of filling said contracts, and that the said contract of May 2, 1905, was entered into between the parties with the understanding and agreement that the same was made subject to the duty of the defendant to make the deliveries called for by the other of said contracts; that it was agreed in and by said contract between the parties that should there be any delay or deficiency in the supply of said coal by reason of a shortage of cars to transport it occurring at the mines in Pennsylvania, or at Duluth, or elsewhere, the defendant should be excused from the performance of said contract so far as a failure to so perform should be brought about or caused by a shortage of cars; that such a shortage of cars occurred and

"that if the defendant failed to deliver to the plaintiff any of the coal called for by said contract, it was solely and only by reason of said car shortage"; that "the defendant failed to receive at its docks at Duluth, by reason of said car shortages, the full supply for which it had contracted as aforesaid during the term aforesaid, but that of the supply which it did receive, it distributed and apportioned the same, as it was its duty to do, to the plaintiff and to the other persons, firms and corporations with whom the defendant had contracts as aforesaid," delivering to "each its fair and proper proportion according to their said contracts, so that each and all of said persons, firms and corporations, including the plaintiff, received the amount and apportionment which each and all were entitled to receive under and by virtue of said contracts."

This plea was successfully demurred to by the plaintiff, the demurrer being general and also on the special grounds that the evidence of the matters of defense therein pleaded if admissible at all, would be admissible under the general issue, and that the plea averred "an understanding between the plaintiff and the defendant contrary to the written contract sued on in this suit." A motion of the defendant to carry back the demurrer to the declaration was denied.

At the trial, but before the jury were sworn, the defendant asked leave to file a fifth plea, which averred that the defendant was chartered under the laws of Minnesota for the sole object of mining and manufacturing certain metals and minerals, and had not and never had any power or legal authority to execute the contract sued on concerning coal not mined by the defendant. On the ground that the motion came too late, leave to file this plea was denied, the court also expressing doubt as to the sufficiency of it.

Before this application was made, but also immediately before the trial, a motion had been made by the defendant corporation, through its counsel, to dismiss

the cause for want of jurisdiction. On this motion certain witnesses as well as arguments of counsel were heard by the court. The court denied the motion and the defendant excepted. The bill of exceptions in the transcript of the record contains the evidence alluded to as a part of "the evidence offered, considered, received or rejected, upon the trial of the above entitled cause," and it is also separately certified to be all of the evidence received or considered upon the trial of the motion to dismiss for want of jurisdiction; but the appellee has moved in this court to strike from the record that part of the bill of exceptions which contains the said evidence and the ruling on the motion to dismiss, also the proposed fifth plea and the order refusing leave to file it. This motion was reserved to the hearing. It is based on the ground that all these proceedings are shown by the record to have taken place on Friday, the 28th day of June, 1907, the last day but one of the June term of the Superior Court, and that although exceptions were noted by the appellee on each adverse ruling, no bill of exceptions was settled or allowed or signed at the said June term, nor any further time given at that term in which to present and have signed a bill of exceptions. The jury had been impaneled on the same day, June 28, 1907, and they and all parties after the hearing of the motion were excused until Monday morning, July 1st, when the trial proper began. The bill of exceptions, including the matter complained of and also all the proceedings at the trial proper, was signed, sealed and filed within the time allowed by an order at the July term. The common law record shows the motions in question and their denial on June 28th, but the bill of exceptions, which governs, contains matter which makes it doubtful whether the motion to dismiss can be considered finally disposed of at the June term.

The trial judge declared that "without expressing any decided opinion about the matter, he would con-

tent himself with saying that his impression was against the motion.'' Counsel for defendant then asking if he understood the court's judgment was to be reserved, the judge replied: ''I will overrule it for the present,'' and counsel declared, ''I will note an exception for the purpose of preserving our rights.''

The recital which follows, made in August, that ''the above and foregoing was all of the evidence offered, received or considered upon the trial of the above motion to dismiss for want of jurisdiction, *which motion was overruled by the court,* to which ruling of the court the defendant by its counsel then and there duly excepted,'' may refer the final overruling of the motion and the final exception quite as well to a later period as to the one of the preceding colloquy.

If the motion to dismiss and the evidence which was offered in support of it, are to be considered finally disposed of at the June term, the question whether appellee has not a right to have the matter objected to stricken from the bill of exceptions, is, under the decisions of the Supreme Court cited to us, a serious one. We have, however, no disposition to apply harshly a doctrine so technical as the one invoked here. The appellee moved below (as the bill of exceptions itself shows) to have this matter stricken from the bill, and the trial judge refused to ·do it—to which ruling the appellee excepted. The appellee has assigned no cross-errors, and we think that independent of other considerations he is foreclosed by the acquiescence in the action of the trial judge, which we will presume from this fact. The motion of appellee reserved to the hearing is therefore now denied.

After the pleadings were thus settled, the cause was submitted to the jury on evidence and arguments presented on both sides. At the close of the plaintiff's evidence and again at the close of all the evidence, the court denied a motion of the defendant for

the exclusion of the evidence heard from the jury, and for a peremptory instruction.

The plaintiff tendered five instructions, all of which were given by the court. The defendant offered four which were given and eight which were refused, the latter including three each of which called for a peremptory instruction on one of the counts of the declaration.

The jury returned a verdict for $10,200, and the defendant moved in writing to set aside the verdict and grant a new trial, alleging thirty-four reasons therefor, covering rulings on evidence and on instructions, and asserting that the verdict was against the weight of the evidence and against the law. On the denial of this motion the defendant moved in writing to arrest the judgment and set forth as reason therefor, that the record and proofs showed want of jurisdiction over the person of the defendant and over the subject-matter of the suit; that the court erred in sustaining the respective demurrers to pleas 3 and 4, and that the declaration was insufficient to support the verdict and judgment.

This motion in arrest was also denied, and judgment on the verdict and this appeal followed. In this court the assignments of error attack the rulings on the demurrers to the pleas 3 and 4; the ruling on the motion to dismiss for want of jurisdiction; the ruling refusing to allow defendant to file its fifth plea; rulings on evidence and on instructions, including the peremptory ones offered; the rulings denying the motion for a new trial and in arrest of judgment.

It will be seen by the foregoing statement that great stress was laid by the defendant below, and is here laid, on the theory that the court was without jurisdiction because the defendant was a Minnesota corporation that had never complied with the laws of Illinois in relation to foreign corporations. "To be sued" as well as "to sue," it is urged, is a corporate franchise,

and the courts of Illinois cannot entertain any suit against a foreign corporation in whose behalf they could not sustain a suit.    This argument is fortified by the proposition that the commencement of the suit was by the garnishment of Illinois debtors of the defendant, which debtors the defendant would have been forbidden by the laws of Illinois to pursue in Illinois courts.    No greater right belongs, it is said, to the plaintiff by virtue of its garnishment, than would have belonged to the defendant.    Further, it is said that the foreign corporation Act of 1905 impliedly forbids the right to set-off in every suit where there has not been a compliance with its provisions.    Therefore, to subject a foreign corporation to suit would be to do so without its having the right of set-off.    This would be unconstitutional, because the Constitution requires all laws relating to the courts to be general and of uniform operation.

The arguments concerning the commencement of the suit by garnishment and concerning the denial of the right of set-off are rather ingenious than sound.    The defendant is in court by the general issue, duly pleaded, without limitation.    It is in court also by a recognizance in open court, entered into for the purpose of releasing the garnishee.    It matters not how the suit was begun, and we need not discuss the question raised about it.    If it be true (concerning which we express no opinion) that no set-off could have been urged by the defendant in this suit, this would not be a fatal objection to a suit against it.    If it could not avail itself by a plea of set-off in this jurisdiction of a claim against the plaintiff, that claim would be reserved for it unsatisfied and perhaps sustainable elsewhere.    Unless "the right to be sued" is one of those "corporate powers," the exercise of which is forbidden to a non-complying foreign corporation by the Act of May 18, 1905, entitled "An act to regulate the admission of foreign corporations for profit to do

business in the State of Illinois," there is no ground for denying the jurisdiction of the Superior Court over this defendant. We are not of the opinion that it is. It is not a sound proposition that because a corporation has not qualified itself by conforming to what are substantially the rules which domestic corporations have to live by to do business in this State and to pursue their remedies against citizens of this State, it can escape action against it in the courts of this State by citizens of this State when its property has been found here. Still less is it a sound proposition that it can claim such exemption from jurisdiction even after it has voluntarily appeared and pleaded and entered into a recognizance to abide the result of the suit and has thereby secured a release of its attached property.

It is true that "to sue and to be sued" is a common form of words in indicating powers included in charters of incorporation, but it does not follow from this that a corporation cannot "be sued" without reference to its charter powers.

Even the cases in New York and Massachusetts (Robinson v. Oceanic Navigation Co., 112 N. Y. 315, and Desper v. Continental Water Meter Co., 137 Mass. 252), mentioned in Barrow Steamship Company v. Kane, 170 U. S. 100, only to be held inapplicable to the jurisdictional questions in a Federal Court, are authority for no such claim as this.

In Barrow Steamship Company v. Kane, the contention of the defendant, which is recited in the opinion of the court, was that "being a foreign corporation, no suit could be maintained against it in *personam* in this country *without its consent, express or implied,*" and this contention was negatived by the court. In Robinson vs. Oceanic Steam Navigation Co. the Court of Appeals of New York simply decided that *under jurisdictional statutes* of New York in "*a case where the plaintiff is a non-resident,* the defendant a foreign

corporation, and the cause of action did not arise within this'' (New York) ''State,'' ''no court within this State'' (New York) ''has jurisdiction of the action,'' nor would consent give it.

In Desper v. Continental Water Meter Co. the Supreme Judicial Court of Massachusetts decided that in that Commonwealth ''a foreign corporation, unless jurisdiction over it is given by the statute, *or unless it voluntarily appears,* cannot be sued at law *except by means of an attachment of its property.*''

If it should be conceded that all that is said in these last two cases is the law of Illinois, it would not affect the present litigation. In this State, however, where a mere *de facto* corporation can be effectively sued by its assumed corporate name (Clarkson v. C. & N. S. Dispatch, 6 Ill. App. 284, and cases therein cited), these cases do not state the law.

It is also claimed, however, that the Superior Court had no jurisdiction in this case, or should have refused to take it, because the plaintiff under the laws of Minnesota could not have sued in Minnesota, not having complied with the law of Minnesota, and therefore, although an Illinois corporation, should not be allowed to sue a Minnesota corporation on a contract made and to be performed in Minnesota. This claim is based on the ''comity'' which it is said should exist between the States. There is no comity between States which has ever been responsible for such a rule. The courts of Illinois have a very tender regard, developed by local self-interest, for the pecuniary and personal rights of the citizens of Illinois (see *e. g.* Smith vs. Berz, 125 Ill. App. 122, and cases there cited), and have frequently enunciated rules which have given to such citizens broader rights than foreign litigants could have in this forum. There is no case, however, where they have closed their doors against a citizen or resident of Illinois simply because he or it was forbidden to use the tribunals of the State of the opposing party.

Reciprocity of this kind between any two States, we think, will be looked for in vain.

It is further urged that the contract sued on in this case is void because it was made in Minnesota to be performed in Minnesota between an Illinois corporation (Hunter W. Finch & Company) and a Minnesota corporation (The Zenith Furnace Company), and that Hunter W. Finch & Company being a foreign corporation was doing an act in Minnesota which was therein forbidden to it by law and could furnish no basis for a valid claim. In other words, the contract was utterly void because illegal. The plaintiff contends that this question is foreclosed to the defendant by the state of the pleadings; that any error in sustaining demurrers to Plea No. 3, described in the statement prefixed hereto, was waived by the defendant's pleading over, and that no competent evidence was offered under the general issue to sustain the contention that plaintiff was a corporation foreign to Minnesota and so transacting business there as to make its contract there illegal and void.

Considerations tending to sustain the rejection of the offers of counsel which are in this argument alluded to, are not altogether wanting, but we are not of the opinion that the filing of Plea 4 was any waiver of error in the disposition of Plea 3; and we prefer to treat this question, which is a serious and important one, on its merits and not with technicality. There is no doubt the defense was attempted in pleading and by the offered proof, that the contract was void and unenforceable anywhere, not only because the single act of making it was illegal, but also because it was connected with and followed by a series of sales of coal, which constituted a doing of business in Minnesota manifestly illegal.

The statutes of Minnesota the violation of which, it is claimed, makes this contract void, provide as follows:

First.   That a domestic corporation in Minnesota is one organized in that State, and a foreign corporation, every other one.

Second.   That "Every foreign corporation for pecuniary profit, before it shall be authorized or permitted to transact any business" in Minnesota, "or to continue business" therein if already established, or to acquire, hold or dispose of property within "Minnesota," or to sue or maintain any action at law or otherwise in any of the courts of Minnesota, "shall have and maintain a public office or place in that State for the transaction of its business, and shall appoint an agent, who shall reside in the County in which said public office is located, duly authorized to accept service of process and upon whom service of process may be had in any action to which said corporation may be a party; and service upon such agent shall be due and personal service upon such corporation."

Third.   That every such foreign corporation "now or hereafter doing business within Minnesota, shall file with the Secretary of State" of Minnesota "a copy of its charter, or certificate or articles of incorporation, duly authenticated," etc., and "a statement duly sworn, showing the proportion of the capital stock which is represented by its property located and business transacted" in Minnesota, and shall pay into the State Treasury a certain sum, proportioned to the amount of such capital stock so represented.   "Upon compliance with that provision the Secretary of State shall issue" to the corporation a certificate "that it has complied with the laws of Minnesota and is authorized to do business" therein, which certificate "shall be prima facie evidence that the corporation is entitled to all rights and benefits thereof and of the valid creation and organization of such corporation, and such corporation shall enjoy those rights and benefits for the period of thirty years from and after the date of such certificate, and may renew them for like periods

thereafter by refiling its articles of incorporation and repeating the payment of the required fees."

Fourth. That every such foreign corporation for pecuniary profit now doing business in, or which may hereafter do business in Minnesota, which shall neglect or fail to comply with these conditions, *"shall be subject to a fine of one thousand dollars, to be recovered before any court of competent jurisdiction"*; that the Secretary of State, as often as he may be advised that corporations are doing business in contravention of the law, shall report the fact to the county attorney, etc., and the county attorney *shall institute proceedings to recover the fine aforesaid, "and no corporation which shall fail to comply with the foregoing provisions shall maintain any suit or action, either legal or equitable, in any of the courts of this State, upon any demand, whether arising out of contract or tort."*

Various exceptions not necessary to notice here are made to the application of these statutes.

We do not find in these statutes, nor do we find in the decisions and opinions of the Supreme Court of Minnesota offered in evidence and cited to us, anything which compels us to regard the contract as void. It seems to have been made in good faith by both parties and partly executed. It certainly was not in its nature immoral, and mere prohibition of certain conduct does not always make an outlaw of the offending party. The Legislature of Minnesota in this case saw fit, in making a statute which is apparently principally a revenue law, to provide for the penalties of breaking or ignoring it. It might have declared its policy at least, if such was its policy, to consider any contract made while the law was ignored, void, but it contented itself with imposing a penalty, which, it is enjoined, should be sued for "as often" as the Secretary of State is advised of violation, etc., and in addition declaring that *the Courts of Minnesota were closed* to the offending corporation for the enforcement

of contracts made by it or the vindication of torts suffered by it. It had no power to make a similar provision about the courts of any other State, and it did not attempt to deal with anything but penalties and remedies.

In the light of the reasoning and language used by the Supreme Court of Illinois in United Lead Co. vs. The Reedy Elevator Company, 222 Ill. 199, the question raised by the defendant here may not be free from difficulty. But the statutes of Illinois and Minnesota are not identical; the decisions of the Supreme Court of Minnesota go no farther than to say that, under the Minnesota statute an action cannot be maintained in Minnesota courts which was begun before the foreign corporation complied with the law, and we are not disposed to deny to an Illinois resident in an Illinois court the benefit of a contract which we cannot convince ourselves a Minnesota court would have refused to it if it should have complied with the law before bringing suit.

Should the Supreme Court view this point differently, it will be then necessary to decide—what we do not now decide—whether by the evidence which was admitted before the jury it could be said that this contract in question was an incident of a foreign corporation doing business in Minnesota, or whether by the exclusion of evidence offered to prove this alleged fact, the court erred under the conditions surrounding the offer.

We place our decision on the broad ground that the admission of the fact alleged would not have defeated this action.

Another line of attack on the validity of the contract is based on the theory that it was without the chartered or corporate powers of the defendant corporation to make, that evidence was offered and erroneously ruled out tending to show that the general nature of the business specified in the articles of incor-

poration of the defendant, being "mining, smelting, re-
ducing, refining and working of iron ores and other
minerals and the manufacture of iron, steel, copper
and other metals"—its president and agent contracted
from the producers for 500,000 tons of coal for the
season between May 2, 1905, and March 31, 1906, and
of this 500,000 tons only 125,000 was to be used in min-
ing, smelting, reducing, refining and working iron ores
and other minerals, and manufacturing iron, steel, and
copper and other metals, and that the remainder
thereof was to be sold by him to the coal trade.

The argument is that this would have shown the con-
tract made with the plaintiff *ultra vires* and therefore
void, and that this was a valid defense which the de-
fendant should have been allowed to make. We do not
assent to this. The defense of *ultra vires* made by a
corporation to avoid the effect of its own contracts is
one to be allowed with caution at best, and we do not
think it can be applied to a sale of coal by a com-
pany which, to carry out its express purposes, must
secure from time to time a very great quantity of coal
from the mines, and provide facilities for handling
and storing the same. It cannot be said by the courts
in such a case that a part of what must necessarily be
a vast amount in any event, is within its power to buy
and at its option to sell again, and a part it is utterly
unable to make a contract about.

By the elimination of these defenses extrinsic to the
terms of the contract, we are brought to the merits of
the cause which depend on those terms. The questions
remaining are practically, what was the character or
nature of the contract made; was it broken by the de-
fendant without the fault of the plaintiff, and if so,
was the correct measure of damages for its breach ap-
plied.

We set out the contract in beginning this opinion. It
is true that it is something like a mermaid, or like the
classical description of Scylla—"*prima hominis facies
—postrema pristis.*"

Its first words are those as clearly indicative of a contract of purchase and sale as the English language can furnish. The first party agrees "to sell"—the second party agrees "to buy"—a certain estimated amount of coal "at the following prices."

But then the tone of the contract changes. Instead of stating definitely a price, it is provided that in case the selling point of Youghiogheny coal is three dollars, "a comission of 10¢ a ton" is to be paid to Finch & Co., and "thereafter any premium obtained above $3 for the coal is to be divided three-fifths to the Zenith Company and two-fifths to Finch & Co." The Zenith Company binds itself "to make shipments promptly and in every reasonable way to assist Finch & Co. in disposing of" the coal. The last clauses look very much like a contract between principal and sales agent to sell coal for them on a commission and a share of the profits. The first part of the contract, however, is sufficiently explicit to show that this cannot be its only purport.

It is quite conceivable that what was in the minds of the parties when they executed the contract may have been something like this: "The Zenith Co. appoints the Finch Co. its selling agent for its coal. The Finch Co. accepts the appointment. The Zenith Company will allow 10¢ a ton to the Finch Company for coal sold at $3 a ton, and in addition 2/5 of any amount obtained over $3 a ton." But in return for this appointment, compensation and profits, the Finch Company undertakes to dispose of 50,000 tons before April 1, 1906, and also guarantees, or rather takes upon itself, the payment for all the coal which it does dispose of by the 20th of the month following the shipment which the Zenith Company makes to the customer. If the Finch Company does not dispose to third parties of the 50,000 tons, it will nevertheless take and pay itself for enough to make up that amount. There is no provision made for the contingency of a price less

than $3 a ton for the coal, because there is no reasonable probability of its existence at any time. On its part the Zenith Company agrees, subject to exceptions noted, to furnish this 50,00 tons when demanded in as near monthly instalments as market conditions will permit at its docks in Duluth.

If this is what the parties meant, although they did not so state it, the effect would have been, if the contract had been properly drawn (since the price of neither Ella nor Youghiogheny coal did within the period involved go below $3 a ton), exactly what it is claimed by the plaintiff is now the effect of the purchase and sale contract which it is alleged was actually made, and we cannot see how the measure of damages for the alleged breach would have been different.

But notwithstanding what we may suspect would have been a clearer and better expression of the real purpose or ideas of the parties before a difference arose between them, we cannot make a contract for them nor substitute one contract for another.

Our disposition should be, however, to give some effect—and that the one apparently its intention—to a contract freely entered into between competent parties. The parties here chose, in as strong language as possible, to call their contract an agreement of purchase and sale, and we must so consider it. The price, we think, was to be $2.90 if Youghiogheny coal was $3 a ton, but if Youghiogheny coal was over $3 a ton $2.90 plus three-fifths of any difference between $3 and such selling price. It is unnecessary for us to decide what would have been the effect of the contract had the price of Youghiogheny coal gone below $3, for no such condition happened.

The defendant claims that the contract, even in its first clause, was not a purchase and sale of 50,000 tons of coal, but an executory contract that the second party would buy and the other party would sell in the future as much Ella coal as the first party might

choose to take, up to 50,000 tons; that being the amount that the second party guessed or "estimated" that it might want.   This construction is, as we understand it, the basis of the point in defendant's argument, that the contract is wanting in mutuality and therefore void.   Cases are cited to the doctrine that where the intending purchaser in an executory contract does not undertake to take a certain amount of merchandise, but only what he may require up to a certain amount, there is no mutuality and the contract is void.   If the word "want" is equivalent to "require," Bailey v. Austrian, 19 Minn. 465, is an authority for this proposition.   This doctrine, however, has been repudiated by the Supreme Court of Illinois.   National Furnace Co. v. Keystone Mfg. Co., 110 Ill. 427; Minnesota Lumber Company v. Whitebreast Coal Company, 160 Ill. 85.

But even were it the law of Illinois, it would not be applicable to this case.   As we have said, we desire, if possible, to give operation to contracts freely entered into.   As the Supreme Court in Minnesota Lumber Co. v. Whitebreast Coal Company (*supra*) says: "The rule is that when the terms of a contract are susceptible of two significations, that will be adopted which gives some operation to the contract, rather than that which renders it inoperative.   A contract should be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such construction is wholly negatived by the language used."

We do not consider the word "estimated" as meaning anything more than "more or less"—"subject to slight variation from transportation accidents and the impossibility of exact measurements until actual delivery."   It is much the same in effect as the word "say" when used before a statement of quantity in business correspondence.   Judge Richardson in the U. S. Court of Claims, said that the phrase "more or less" was equivalent to "about," "say" and "by esti-

mation," and meant "a quantity approximate to that specifically named, allowing only such a slight variation therefrom as from the circumstances of the case or the nature of the articles may seem reasonable to the court." Brawley v. United States, 11 U. S. Court of Claims, 522—532.

If in deference to the rule that where there is something remaining to be done by the vendor—separation from a mass and delivery, etc.,—a sale is not executed, the contract of sale in this case must be considered in any sense executory rather than an actually consummated sale, passing the title (a result which the mere use of the words "agrees to buy" and "agrees to sell," as distinguished from "buys" and "sells," would not effect—Martin v. Adams, 104 Mass. 262), it is none the less a concluded agreement of sale for a sufficiently definite amount of merchandise to remove it from the claimed objection of want of mutuality.

We do not think there was anything in the contract that required or allowed the parol testimony concerning the alleged patent ambiguities of words used in the contract. Discussion of this would not be useful. It is a matter undoubtedly in which difference of opinion would not be helped by such discussion. We do not think the exclusion of the offered testimony was erroneous.

Our conclusion being that the contract was a valid one, capable of enforcement by either party against the other, the questions remaining are: Was it broken by the defendant without the fault of the plaintiff, and if so, what was the correct measure of damages? It is not denied that the Zenith Company declined to furnish the coal specified in the contract, although it was demanded by the plaintiff company, but the Zenith Company claimed when it refused to furnish the coal, claimed before the jury and claims here, that in so refusing it was justified by the provision in the contract that it was made subject to strikes, shortage

of cars, and other conditions beyond the control of the parties.

As expressed in the letter of the defendant to the plaintiff, of November 2, 1905, the contention of the defendant was: "There is a great shortage of cars for shipment of coal from the mines to Lake Erie and the receipts of coal by the Furnace Company are on that account certainly going to be reduced to a point that renders it necessary for us to notify you" that we must "exercise the privilege granted in the clause of your contract with the Zenith Furnace Company which provides that the contract be subject to strikes, shortage of cars, and other conditions beyond the control of the parties hereto."

The jury found against this contention. It was left to them, under an instruction of the court tendered by the defendant and given by the court, as follows:

"The jury are further instructed that if they believe from the evidence that the defendant failed to deliver to the plaintiff any of the coal called for in the contract involved in this case, and that the failure so to deliver was by reason of strikes, shortage of cars and other conditions beyond the control of the plaintiff and defendant in this case, then the jury should find the issues for the defendant as to such coal undelivered, if any."

We do not hold that the decision of the jury was against the weight of the evidence. It seems to us that it was not. The evidence showed, without dispute, that the defendant had on its docks a sufficient amount of coal to carry out the terms of its contract with the plaintiff.

Much of it, the evidence tended to show, was sold or contracted for sale after the contract was made with the plaintiff.

The ground, however, for arguing that the failure to perform the contract was due to "shortage of cars and other conditions beyond the control of parties thereto," is that the mine did not produce on the dump

as much coal as was expected; that there was a general shortage of cars on the railroad on which the mine was situated, which made it impossible for defendant to get all the coal it had ordered or required even had it been mined; that these conditions were not of its own making and were "beyond its control." But in addition to this, inasmuch as the defendant did get many times as much coal as the plaintiff's contract called for, counsel find it necessary to insist, and do insist, that the duty of the Zenith Company was only to make a *pro rata* distribution of all the coal it did receive between the plaintiff and the other persons who had bought prior to, contemporaneously with, or subsequent to the plaintiff. But this is not the law, nor was it competent to prove such a "custom" in the coal trade. It would be a simple abrogation of a contract of sale (as we have decided this was) to allow effect to such evidence. And it would be equally an abrogation of such a contract as we hypothetically set forth as conceivably the one it was in the minds of the parties to make.

The truth appears to be that the ground on which the president of the Zenith Company in his own mind really placed his defense, as shown by that which the evidence discloses of his words and actions, was that he chose, against the plain meaning of the words that he had used in it, to consider the contract with the Finch Company an appointment to sell coal on a profit commission, which appointment he could cancel at any time when it proved embarrassing or inconvenient. If it were such a contract, there would be no case here for the plaintiff, but when it was made the parties negatived this theory of it by the language they used.

The question of the measure and amount of damages remains. Under the construction of the contract we are constrained to make—that it was one for purchase and sale—the instruction given at the instance of the plaintiff on this point was correct:

"The court instructs the jury that the measure of

damages in this case, if you shall find that the plaintiff is entitled to recover damages, is the difference, if any, between the market price of the coal mentioned in the contract offered in evidence herein and the contract price at the time or times the same should have been delivered.''

The defendant, however, argues that the plaintiff is entitled to no damages that it did not prove by showing sales by it out of this expected coal—manifestly again a reference of this controversy to the theory on which it insists, that the contract was not for purchase and sale, but for an agency to sell for defendant.

The evidence showed the defendant definitely refused to carry out the contract in the sense which the plaintiff and the Superior Court and this court have put on it, and the buyer, as the jury were correctly instructed, was justified ''in acting on the refusal at once and suing for damages,'' although the contract was for the sale of a commodity to be delivered in installments.

The amount of the judgment does not exceed the amount which the evidence tends to show was justified under these rules.

The length of this opinion already, due to the number of questions raised, renders it inadvisable that we should take up in detail the rulings on instructions and evidence of which the appellant complains. They are numerous, but as appellant's counsel imply in argument, they are largely due to the variance between the plaintiff's and the defendant's theory of the contract involved and consequently of the law suit which grew out of it. We have considered them all and cannot say that we find reversible error in the record.

The judgment of the Superior Court is therefore affirmed.

*Affirmed.*