GOLDEN CYCLE MINING CO. v. RAPSON COAL MINING CO. et al.

(Circuit Court of Appeals, Eighth Circuit.    May 1, 1911.)

No. 3,342.

1. CONTRACTS (§ 313*)—RENUNCIATION—REMEDIES OF INJURED PARTY.

After the renunciation of a continuing contract by one party, the other may at his option consider himself absolved from any future performance of it, and may sue at once for any damages he has suffered from the breach of it, or he may wait until performance should have been completed, still holding it as prospectively binding for the exercise of this option.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279; Dec. Dig. § 313.*]

2. CONTRACTS (§ 10*)—VALIDITY—MUTUALITY OF OBLIGATION—"MAY USE."

An agreement by one party to furnish and by the other party to purchase all the coal of a stated kind the second party "may use" in the operation of a mine and reduction works during a limited time is valid, and binds the purchaser to take from the seller all the coal that may be needed or required in the conduct of such business during the time specified.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 21–40; Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 8, pp. 7228–7237; vol. 8, p. 7825.]

3. CONTRACTS (§ 217*)—CONSTRUCTION—OPTION TO TERMINATE.

Under a contract to furnish to a mining company all the coal it should require in its business during a stated time, which gave it the option, in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the event it should acquire a substantial interest in a coal mine, as owner, lessee, or stockholder, whereby it secured the control of the operation of such mine, to terminate the contract by giving 90 days' written notice, to entitle it to exercise such option, it must at the time of giving such notice have acquired the interest stated in a coal mine and the giving of the notice without having previously acquired such interest was ineffective to terminate the contract, although such interest was afterward acquired.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1006–1009; Dec. Dig. § 217.*]

4. EVIDENCE (§ 244*)—ADMISSIONS.

In an action by corporations to recover damages for breach of a contract which defendant had the option to terminate by notice under certain conditions but not otherwise, and which it claimed had been so terminated, it was not error to exclude testimony as to a conversation between the president of plaintiffs and the agent who served the notice, tending to show that such president recognized the right of defendant to terminate the contract, especially where it was not shown that he had any knowledge at the time as to whether the facts existed which authorized such termination and which was essential to establish a waiver of the conditions or an acquiescence in the cancellation of the contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 916–936; Dec. Dig. § 244.*]

In Error to the Circuit Court of the United States for the District of Colorado.

Action at law by the Rapson Coal Mining Company and the Curtis Coal Mining Company against the Golden Cycle Mining Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

Tyson S. Dines, for plaintiff in error.

Henry McAllister, Jr. (Joel F. Vaile and William N. Vaile, on the brief), for defendants in error.

Before VAN DEVANTER and HOOK, Circuit Judges, and CARLAND, District Judge.

PER CURIAM. On the 11th day of July, 1906, the Golden Cycle Mining Company, plaintiff in error, made and entered into a contract with the Rapson Coal Mining Company and the Curtis Coal Mining Company, defendants in error, which, so far as is material to the questions raised upon this record, was in the following language:

"This agreement, made and entered into this 11th day of July, 1906, by and between the Golden Cycle Mining Company, a West Virginia corporation doing business in the state of Colorado, and hereinafter called the Mining Company, party of the first part, and the Rapson Coal Mining Company and the Curtis Coal Mining Company, both Colorado corporations, hereinafter called the Coal Companies, parties of the second part, witnesseth:

"Whereas the mining company is now operating one or more metalliferous mines in the Cripple Creek mining district in Teller county, Colorado, and intends in the near future to begin the operation of its ore reduction works near Colorado City, El Paso county, Colorado, and desires to secure a continuous supply of coal for use in the operation of its said mines and reduction works, and any other mines or reduction plants it may hereafter acquire in the same vicinity, and

"Whereas, the Coal Companies are engaged in the business of mining lignite coal in and upon the coal mines which they control for such purposes

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

near Colorado Springs, Colorado, and mines of bituminous coal near Rugby in Las Animas county, Colorado, and are desirous of enlarging their market for the output of coal from said mines:

"Now Therefore, the parties hereto have agreed as follows:

"(1) During the period beginning with the date hereof and ending December 31, 1910, the Mining Company agrees to purchase from the Coal Companies all the lignite coal it may use in the operation of its said mines and reduction works, and also all the bituminous coal it may use so long as the Coal Companies are able to furnish a good quality of the same at as favorable prices and under as favorable conditions for delivery as other coal mine operators may be willing to furnish the same.

"(2) During said period of time the Coal Companies agree to supply to the Mining Company all of said coal that it may desire to purchase and use for the purposes aforesaid, and make such prompt delivery of the same as the necessities of the Mining Company may require. * * *

"(11) It is agreed that in the event the Mining Company shall acquire a substantial interest in a coal mine as owner, lessee or stockholder whereby it secures the control of the operation of such mine, then the Mining Company may, at its option, declare this contract terminated upon giving the Coal Company ninety (90) days' written notice of its intention to do so."

Immediately upon the execution and delivery of the contract from which the above excerpts are taken, the Coal Companies commenced the performance of said contract and at all times thereafter until the 13th day of May, A. D. 1908, did fully perform all the obligations and agreements of said contract by them or either of them to be performed, and did sell and deliver to the Mining Company and said Mining Company did receive and purchase all the lignite coal required and used by it in the operation of its mines in the Cripple Creek Mining district, Teller county, Colo., and its reduction works near Colorado City, El Paso county, Colo., and said Mining Company did pay to the Coal Companies the contract price therefor.

On the 13th day of May, A. D. 1908, above mentioned, the Mining Company refused to purchase or receive from the Coal Companies any more lignite coal under the contract herein mentioned. July 1, 1908, the Coal Companies commenced this action against the Mining Company to recover damages for the alleged breach of the terms of the contract herein mentioned by the Mining Company in refusing to purchase or receive any more lignite coal under said contract after May 13, 1908. The Mining Company appeared in the action and after a trial in the court below a verdict was rendered in favor of the Coal Companies and against the Mining Company upon which final judgment was rendered in favor of the Coal Companies for the sum of $21,250, besides costs and disbursements. The Mining Company has removed the case to this court by writ of error.

The damages claimed by the Coal Companies and for which they recovered judgment was for the fair and reasonable profits which would have accrued to them by the performance of the contract mentioned by the Mining Company from May 13, 1908, to December 31, 1910. On February 13, 1908, the Mining Company served the following notice on Charles H. Curtis, president and general manager of the Coal Companies:

"Colorado Springs, Colorado, February 13th, 1908.

"The Rapson Coal Mining Company and The Curtis Coal Mining Company, Both Colorado Corporations, Colorado Springs, Colorado—Gentlemen: You

are hereby notified that this company has acquired a substantial interest in a coal mine as stockholder, whereby it has secured control of the operation of such mine, and that this company hereby avails itself of the option contained in paragraph 11 of the contract now pending between your companies and this company for the sale and purchase of lignite coal, and hereby in accordance with a provision of said contract, contained in said paragraph 11 thereof, notifies you that said contract shall terminate at the expiration of 90 days from date of the receipt of this communication by you.

"Yours truly,                 The Golden Cycle Mining Company,
                                   "By Jno. T. Milliken, President."

On May 13, 1908, the Coal Companies served the following notice on the Mining Company:

"Colorado Springs, Colo., May 13, 1908.

"The Golden Cycle Mining Company, City—Gentlemen:   You are hereby notified that we decline to release you from your obligations under the contract between us, dated July 11, 1906, and that we deny that said contract has been terminated by reason of any notice heretofore served on us by you. We insist that said contract is still binding and obligatory upon you, as well as upon us, and we are now ready, willing and able, and hereby offer to comply with each and every provision thereof, requiring the performance of any act or thing by us.   We hereby offer to continue to deliver to you the coal mentioned in said contract at the time and place therein mentioned, which coal under said contract you are required to purchase from us, and we request you to notify us forthwith whether you will accept the delivery of said coal, according to the terms of said contract.   You are further notified that we claim that you had not on February 13, 1908, at the time when you attempted to give us notice of the termination of said contract, placed yourself in such a position as to become vested with any right, under Paragraph 11 of said contract, to elect to·terminate the same, or to give us notice of such election.   In the event you persist in your determination to·violate said contract, we will hold you liable for all damages which we may sustain by reason of such conduct on your part.

"Yours very truly,                 The Rapson Coal Mining Company,
                                   "By C. H. Curtis, President.
                                   "The Curtis Coal Mining Company,
                                   "By C. H. Curtis, President."

[1] The rule that a contract may be broken by the renunciation of liability under it in the course of performance, and that suit may be immediately instituted for the recovery of damages based as far as possible on the ascertainment of what the injured party would have suffered by the continued breach of the other party down to the time of the complete performance, less any abatement by reason of circumstances of which the injured party ought reasonably to have availed himself, is firmly established by the case of Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953.

After a careful review of all the cases, American and English, the Supreme Court in the case last cited declares that after the renunciation of a continuing agreement by one party the other party is at liberty to consider himself absolved from any future performance of it, retaining his right to sue for any damages he has suffered from the breach of it, but that an option should be allowed to the injured party either to sue immediately, or to wait until the time when the act was to be done still holding it as prospectively binding for the exercise of this option.

[2] In order to reverse the judgment below, counsel for plaintiff in error urges the proposition that the contract sued on·is not en-

forceable, because the respective promises made by the parties constituting the only consideration supporting the same are not mutually binding, and that the contract is nudum pactum. We think the word "use" in the language of the contract is equivalent to the words "needed, required," or "consumed," and brings the agreement of the parties within the rule enunciated by this court in the case of Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 114 Fed. 81, 52 C. C. A. 25, 57 L. R. A. 696. It is said in the case last cited that:

"An accepted offer to furnish or deliver such articles of personal property as shall be needed, required, or consumed by the established business of the acceptor during a limited time is binding, and may be enforced, because it contains the implied agreement of the acceptor to purchase all the articles that shall be required in conducting his business during this time from the party who makes the offer"

The court cited in support of said rule Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85, 43 N. E. 774, 31 L. R. A. 529; Parker v. Pettit, 43 N. J. Law, 512. This rule was also approved in the case of A. Santaella & Co. v. Otto F. Lange Co. et al., 155 Fed. 719, 84 C. C. A. 145, also decided by this court. We therefore are of the opinion that the agreement above set forth constituted a valid contract on the part of the Mining Company to purchase and on the part of the Coal Companies to supply all the lignite coal needed or required by the Mining Company in the operation of its mines and reduction works during the time specified in the contract.

[3] It is also contended that under and by virtue of the terms of section 11 of the contract herein quoted the Mining Company terminated the contract on May 13, 1908, by giving the notice hereinbefore quoted to the Coal Companies, and which the Mining Company claims it had the right to give by reason of the existence of the requisite facts at the time the notice was given. This renders it necessary to examine somewhat carefully the provisions of said section. We think that the meaning of section 11 is plain, and that it appears therefrom that it was the intention and agreement of the parties to the contract that if the Mining Company should acquire a substantial interest in a coal mine as owner, lessee, or stockholder, whereby it should secure the control of the operation of such mine, then the Mining Company at its option could declare the contract terminated upon giving the Coal Companies 90 days' notice in writing of its intention to do so. In other words, the section means just what it says. By the insertion of this clause in the contract, the Mining Company was providing for the termination of the contract to buy coal from the Coal Companies in the event the Mining Company should acquire such a substantial interest in a coal mine as owner, lessee, or stockholder as would secure to it the control of the operation of such mine. It conclusively appears from the language used that two things should exist in order to give the Mining Company the right to terminate the contract: First, it was necessary that the Mining Company should acquire a substantial interest in a coal mine as owner, lessee, or stockholder whereby it should secure the control of the operation of such mine; second, if such fact existed then the Mining

Company, at its option, could declare the contract terminated by giving ninety days' written notice of its intention to do so. The acquiring of a substantial interest in a coal mine as owner, lessee, or stockholder whereby the Mining Company should secure the control of the operation of such mine, standing alone, was not enough; neither was the giving of 90 days' notice in writing, standing alone, enough to terminate the contract; but the acquirement of the substantial interest above mentioned and also the giving of the notice must coexist in order that the contract might be terminated by the Mining Company. The Mining Company might acquire the substantial interest above mentioned and not exercise its option to terminate the contract by giving the written notice, or, if it gave the written notice without having acquired such substantial interest, then there would be no right in the Mining Company to terminate the contract. It is admitted that the written notice of February 13, 1908, was given according to the terms of the contract. It is claimed, however, by counsel for the Coal Companies that at the time said notice was given the Mining Company had not acquired a substantial interest in a coal mine as required by the terms of the contract. Without detailing all the evidence in the record touching upon the question as to whether the Mining Company had so acquired a substantial interest in a coal mine within the requirements of section 11 of the contract, we may state that said evidence has been carefully read, and we agree with the trial court that the evidence wholly fails to show that at the time of the giving of the notice, February 13, 1908, the Mining Company had acquired a substantial interest in a coal mine as owner, lessee, or stockholder whereby it had secured the control of the operation of such mine, and we are further of the opinion that the trial court did not err in refusing to submit to the jury the question as to whether the Mining Company had so acquired a coal mine.

In view of what we have heretofore said, it follows that the mere giving of the notice without having a right so to do had no effect in terminating the contract.

It is further contended by counsel for the Mining Company that it appears from the record that it did on July 20, 1909, acquire a substantial interest in a coal mine as owner, lessee, or stockholder within the meaning of section 11. This contention is based upon a stipulation made between the parties at the trial of the case in the court below, paragraph 3 of which reads as follows:

"That the books of the Pikes Peak Fuel Company show that its capital stock is and since December 29th, 1906, has been 500,000 dollars, of which $50,000 is preferred and $450,000 is common stock, par value of shares being $10.00 each. On July 20th, 1909, certificate No. 30 for 2,500 shares, or $25,-000, of the preferred stock of said company was issued to the Golden Cycle Mining Company, and upon the same date certificate No. 98 for 22,550 shares, or $225,500 of the common stock was issued to the said the Golden Cycle Mining Company."

Counsel for the Coal Companies reserved the right of objection to the introduction of this stipulation in evidence as irrelevant and immaterial, and did insist at the trial that it was irrelevant and immaterial for the reason that said paragraph 3 does not show that the

Mining Company, on July 20, 1909, acquired such an interest as is specified in section 11 of the contract and which would authorize the Mining Company to give the written notice of the termination of the contract. We do not think that it is necessary to discuss the question as to whether the facts appearing from paragraph 3 of the stipulation show that the Mining Company did thereby acquire, on July 20, 1909, a substantial interest in a coal mine whereby it secured the control of the operation of the mine within the requirements of section 11, for the reason that we are clearly of the opinion that, even if the Mining Company by virtue of the transaction detailed in paragraph 3 of the stipulation did so acquire such substantial interest, it never exercised its option with reference thereto by giving 90 days' written notice of its intention to terminate the contract because it had so acquired such substantial interest. As we have heretofore explained, the acquiring of the substantial interest, standing alone, did not terminate the contract, nor did the giving of the notice on February 13, 1908, nearly one year and a half before it acquired the interest in the Pikes Peak Fuel Company, have any force or validity to terminate the contract because of the acquirement of the substantial interest on July 20, 1909. The Mining Company could not give the notice until the conditions existed which the contract required should exist before the right to give the notice should arise. We do not say that the notice must have been given at the exact time of the acquirement of the substantial interest—it might have been subsequent thereto, but not before, especially not such a long time before.

[4] Counsel for the Mining Company also insists that the trial court committed error in excluding the offer of its counsel to prove certain facts by the witness Vickroy. Vickroy was the auditor of the Mining Company and served or delivered to Curtis on February 13, 1908, the notice of intention to terminate the contract. It appears from the record that while Vickroy was upon the stand counsel for the Mining Company asked the following question:

"Q. Have any conversation with him (meaning Curtis) at the time you served it (notice of February 13, 1908)? A. Yes, sir.
"Q. What did you say to him? (Plaintiffs object to the question for the reason that it is incompetent and immaterial.)"

Whereupon, Mr. Cunningham, counsel for the Mining Company, made the following offer:

"We now offer to prove by the witness Vickroy now on the stand that at the time he (Vickroy) served the notice upon Curtis, Curtis said to Vickroy, in substance: 'That we (meaning plaintiff companies) regret to lose you (meaning defendant company), but we (meaning plaintiff companies) recognize your (defendant's) right to cancel the contract, and it (defendant's action) is all right. That said Curtis further said at said time in substance that he (Curtis) thought it (meaning defendant company) was making a mistake, would find that it was making a mistake (meaning in business policy), that it (defendant company) would so find; and would again give them (plaintiff companies) its (defendant's) coal purchases."

The offer was again objected to by counsel for the Coal Companies on the ground that it was incompetent and immaterial, and had no bearing upon the issues in the case. The offer was made for the pur

pose of showing that Curtis, as president and general manager of the Coal Companies, acquiesced in and recognized the right of the defendant company to cancel the contract, and for the further purpose of showing that the Coal Companies did not at that time regard their contract with the Mining Company as so valuable as they appeared to think it was at the time of the trial. The court below sustained the objection of counsel for the Coal Companies, and we think committed no error in so doing. It subsequently appeared in the testimony of Curtis that he had no such conversation, but, assuming as we must do for the purpose of determining the correctness of the ruling of the court below that the conversation took place as detailed in the offer, we do not see how the language claimed to have been used by Curtis could in any way determine the rights of the Coal Companies under the contract. It is not shown that Curtis had any knowledge of any facts which would entitle the Mining Company to terminate the contract under and by virtue of its terms, and the language detailed, if used, might have been entirely consistent with the assumption on the part of Curtis that such facts did exist as would authorize the termination of the contract by the Mining Company. Again, it does not appear that Vickroy at the time he served the notice had any authority from the Mining Company or stood in such relation to it as to be a person with whom Curtis could make any agreement in regard to waiving the Coal Companies' rights under the contract, and the question of waiving rights under the contract was not the business the parties were engaged in. In Bennecke v. Insurance Co., 105 U. S. 359, 26 L. Ed. 990, the Supreme Court used the following language:

"A waiver of a stipulation in an agreement must, to be effectual, not only be made intentionally, but with knowledge of the circumstances. This is the rule when there is a direct and precise agreement to waive the stipulation. A fortiori is this the rule when there is no agreement either verbal or in writing to waive the stipulation, but where it it sought to deduce a waiver from the conduct of the party. Thus, where a written agreement exists and one of the parties sets up an arrangement of a different nature, alleging conduct on the other side amounting to a substitution of this arrangement for a written agreement, he must clearly show not merely his own understanding, but that the other party had the same understanding."

Numerous other errors are discussed in brief of counsel for plaintiff in error, but an examination of the record convinces us that they are wholly without merit, and, without further discussion, we are of the opinion that the judgment of the court below should be affirmed; and it is so ordered.