[No. 6404.]

# CITY OF COLORADO SPRINGS v. PIKE'S PEAK HYDRO-ELECTRIC COMPANY, ET AL.

1. MUNICIPAL CORPORATIONS—*Contracts—Construction.* What is received by a city for the grant of a franchise is to be considered in interpreting the provisions thereof imposing duties upon the grantee. (172)

2. ——*Validity.* A city is not to be charged by implication but only upon express contract. (188)

3. ——*Construed.* The city, by ordinance, granted to Jackson the right and privilege of erecting and operating within its limits, a plant for the production and distribution of the electrical current, the right and privilege to construct, maintain and operate dams, ditches, flumes, pipe-lines, and conduits, for the transmission of such current, and the right to divert and use, under certain conditions, for the generation of electricity, the waters of the streams, pipes and conduits of the city. Jackson, on his part, among other things, agreed to complete by a day named a certain tunnel for conveying water to the city, and, by section 9 of the ordinance, to furnish to the city "such arc lights * * * as may be required by such city for lighting its streets", at a specified rate; also to furnish to the city, free of cost, electricity for lighting the buildings of the city, and "such electrical power * * * as the city may specify * * * not to exceed fifty horse-power"; and to at all times during the term of the grant "furnish to the city" on a certain notice and demand "such other power as may be required for municipal purposes at the same price paid by the most favored customer". *Held* that the city was entitled to demand from the defendant, successor in interest of Jackson, and as against the intervenor, the most favored customer of defendant, electric power to the volume of 10,000 kilowat hours per day, for the purpose of lighting the strets, parks, buildings and other public places of the city, and the residences and places of business of its inhabitants, at the same rate and price paid by the intervenor; that such purposes were municipal in character, within the meaning of the ordinance, and that such demand was not in contravention of any right or privilege granted to Jackson by the ordinance, or any agreement of the city therein contained; that the most favored customer having notice of the terms of the ordinance, at the time of entering into its contract with the defendant, was affected by its provisions; that the ordinance contained no express agreement of the city to take from Jackson any electrical current whatsoever for lighting its streets or public places, and that such agreement was not to be

implied; that the city was not required to take, or agree to take, the same minimum annual volume of the electrical current as contracted for by the intevenor; that the price to be paid by the city was the same as stipulated for by the intervenor, and to be diminished or increased according to the schedule set down in the intervenor's contract, according to the monthly consumption; and finally that the defendant was not entitled to contend that no vote of the electors of the city had been had, authorizing the construction and maintenance of an electric lighting plant.    (174, 193)

*Appeal from El Paso District Court*—HON. CHARLES CAVENDER, Judge.

Mr. W. B. PRICE, Mr. C. L. McKESSON and Mr. IRA HARRIS, for appellant.

Mr. R. L. HOLLAND and Messrs. SCHUYLER & SCHUYLER for appellees.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This case was submitted to the district court upon an agreed statement of facts as between the appellant, The City of Colorado Springs, and the appellee, The Pike's Peak Hydro-Electric Company.    Afterward the intervenor, The Colorado Springs Electric Company, was permitted to file its petition of intervention.    The suit arises out of a dispute as to the construction to be given section 9 of a franchise granted by the city to Geoge W. Jackson, now owned by the appellee, The Pike's Peak Hydro-Electric Company.

At the time and long before the date of this franchise the city was the owner and in possession of certain water rights, reservoirs, pipe lines, tunnel rights, flumes, ditches, and real estate, situate in the mountains in El Paso county, west of the city, and constituting a part of the water system of that city.    The requirements of the city de-

manded the construction of a tunnel through which water was to be conducted, so as to flow into the flumes and water pipes of the city. Jackson and an associate entered into a contract with the city to construct this tunnel. Unexpected obstacles intervened which made it impossible for Jackson, who had succeeded to the rights and interests of his associate, to complete the tunnel within the contract price, or at all, because of the unexpected increase in cost, on account of such difficulties.

On the 8th day of September, 1898, Jackson obtained from the city a franchise authorizing the construction and maintenance of a power plant for the generation and sale of electrical power for a period of twenty-five years from that date. Jackson's rights under the franchise were in substance as follows:

"The right and privilege of laying, maintaining, and operating such conduits, cables, and wires in the streets and alleys within the fire limits of the city, and of erecting, maintaining, and operating such poles and wires in the streets and alleys of the city, outside its fire limits, as should be necessary for the transmission and sale to the city and its inhabitants, of electricity for the development of electrical power, and the right and privilege of renting space in the conduits. (2) The right and privilege of constructing, maintaining, and operating, at suitable places on the lands of the city, and through the lands, rights of way for streams, reservoirs, flumes, ditches, pipe lines, and conduits of the water system of the city, dams, reservoirs, pipe lines, conduits, power houses, plants, poles, wires, and cables for the transfer and transmission of electrical power, together with the right to use from such lands such earth, stone, and dead timber as might be needed to construct such power houses,

·reservoirs, plants, and dams.  (3)  The right to divert and use for the generation of electric power all the water of any streams, ditches, flumes, pipe lines, conduits, and reservoirs of the city, on condition that all water so diverted should be returned to the water system of the city unimpaired; provided that the use thereof under the contract should not diminish the flow of, nor pollute the water; that the city should determine what constituted waste and pollution; that Jackson, his associates and assigns, should do nothing which would interfere with the successful operation of the city's system of water works; that the work under the contract in the city should be done under the supervision of the city, and that the city reserved its right to exercise its police power over the conduits, poles, and wires provided for by the contract.''

The benefits under the franchise which the city was to receive, were in substance as follows:

1.  The completion of the tunnel on or before December 8th, 1899, as specified in the original contract of 1895.  (2)  The necessary space in all the conduits that should be laid, and on all the poles that should be erected, for the telegraph and telephone wires of the city, and freedom of access and facilities for placing and removing them, equal to those which Jackson and his associates or assigns should enjoy.  (3)  On the expiration of the franchise, December 9th, 1923, any electrical plant used to furnish these lights and this power, and any transforming station, wires, cables, and other improvements which Jackson, his associates or assigns, shall have then constructed, strung, or made, for the purpose of transforming and delivering electricity necessary to furnish these lights and this power, and a twenty inch water pipe line from Lake Moraine to some point in the

town of Manitou, were to become the property of the city.

There was also the obligation upon the part of Jackson contained in section 9 of the franchise, concerning which the dispute in this action arises. This section provides as follows:

"Sec. 9. The said George W. Jackson, his associates or assigns, shall within one year after the completion of the Strickler Tunnel, and during the remainder of the term of this grant, furnish to the City of Colorado Springs, such arc lights of standard 2,000 candle power each, as may be required by said city for the purpose of lighting its streets, alleys, and public grounds, at the rate of five dollars and fifty cents ($5.50) per light per month, said lights to be used from sunset to sunrise during each and every day of each and every month; also, free of cost, such arc and incandescent lights as may be required by the said city for the lighting of the buildings belonging to the said city, not exceeding five arc lights of 2,000 candle power each, and 200 incandescent lights of 16 candle power each, or the equivalent; also, free of cost, such electrical power, to be delivered at such points in the city of Colorado Springs, as the city may specify, as may be necessary for use by said city for municipal purposes, said power not to exceed fifty (50) horse power; and will at all times during the term of this grant furnish to the said city such other power as may be required for municipal purposes, at the same prices that are paid by the most favored customer of the said George W. Jackson, his associates or assigns, provided, the city give the said George W. Jackson, his associates or assigns, ninety days notice of its intention to use any of said power in excess of fifty horse power, and the amount required."

Upon the credit of this franchise Jackson was en-

abled to secure a large amount of money with which to discharge his debts, and proceed with the completion of the tunnel. He afterwards organized a corporation to which he assigned all his rights and privileges under the franchise, known as the Pike's Peak Power Company, which company later transferred its interest in the matter to the Pike's Peak Hydro-Electric Company, a corporation, and the appellee here. This franchise was before the United States Circuit Court of Appeals upon the validity of a subsequent ordinance of the city purporting to repeal the ordinance granting the franchise. 105 Fed., 1, 44, C. C. A., 333.

Many phases of the Jackson franchise were there discussed, and counsel for both parties to this proceeding, cite the case, and to some extent rely on it. The principal question in that case however, was the validity of the repealing ordinance, and such ordinance was held to be in violation of section 10, art. 1, of the Federal constitution which prohibits the passage of a law impairing the obligation of contracts, and the fourteenth amendment of the constitution which forbids the taking of property without due process of law. Here both parties stand upon the validity of the ordinance granting the franchise in question, but contend for a widely different construction of some of its provisions. In addition to what has been said, the agreed statement recites: (1) That Jackson or his assigns completed the tunnel referred to in the ordinance, known as the Strickler Tunnel, and has constructed and is now operating, by means of water taken, under the ordinance, from the water system of the city of Colorado Springs, an electric power plant, for the purpose of generating electric current for all purposes to which it may be applied: (2) That the defendant has heretofore been furnishing to the plaintiff free, such

arc and incandescent lights as plaintiff has demanded, as and·for the arc and incandescent lights which the plaintiff under section 9 of said ordinance is entitled to receive free of cost, and no controversy now exists between the parties hereto as to such arc and incandescent lights; that the defendant is now supplying to the plaintiff, arc lights for the purpose of lighting the streets and alleys of the plaintiff, and·charging for the same at the rate of $5.50 per month, under the provisions of section 9 of said ordinance:   (3)   That the Colorado Springs Electric Company was on January 31st, 1903, and now is a corporation organized under· the laws of the State of Colorado, and engaged in the business of supplying to the inhabitants of the City of Colorado Springs, electric current for light, power and other purposes; that on or about January 31st, 1903, the appellee made and entered into a contract with the said The Colorado Springs Electric Company, which said contract is still in force, and which covers a period of sixteen (16) years from its date, and which said contract said The Colorado Springs Electric Company has the option to renew or extend for an additional period of seven years; that by said. contract the defendant agreed to deliver, .and now is delivering, electric power to said The Colorado Springs Electric Company for the price, under the conditions in said contract set forth; that the price named in said contract is the lowest price that is being paid the defendant by any of its customers:   (4)   That prior to the filing of this agreed case, plaintiff gave the defendant notice of such intention, on its part, and demanded of the defendant that on and after ninety days from the date of such notice, it furnish and deliver to the plaintiff at the price of .585 cents per kilowatt hour, or at such price

as said The Colorado Springs Electric Company is paying for the same, electric power in excess of fifty horse power to the amount of ten thousand kilowatt hours per day, the same to be used by the plaintiff for the municipal purpose of operating an electric light plant, whereby such power shall be distributed throughout the city of Colorado Springs, to be used for lighting the streets, alleys, parks and other public grounds, and the buildings of said city, and also whereby such power shall be sold to and distributed among the inhabitants of said city, to be used in lighting their residences, grounds and places of business. That although the defendant is now able to generate and deliver, and is now generating, by means of water system of the plaintiff, all the electric power and current necessary to comply with the above mentioned demand of the plaintiff, the defendant immediately notified the plaintiff that it would decline at any time to furnish the plaintiff such power, or any part thereof, for the purposes aforesaid, at the price paid therefor by said The Colorado Springs Electric Company, and wholly denied any duty or obligation on its part so to do, and that the defendant has at all times since denied that there was any duty or obligation resting on it under section 9 of said ordinance to furnish such electric power to the plaintiff, for the purposes above mentioned, or at the price aforesaid: (5) The plaintiff claims that the said The Colorado Springs Electric Company is the most favored customer of the defendant power company:

The ordinance granting the franchise and the contract between the Pike's Peak Hydro-Electric Company, and the Colorado Springs Electric Company, referred to in the agreed statement, are set out in full as exhibits.

The prayer of the city under the agreed statement is:

"The plaintiff claims it is entitled to, and prays for a judgment against the defendant decreeing and finding, that under section 9 of said ordinance, it is the duty of defendant, ninety days after this date to deliver to plaintiff electric power in excess of fifty horse power, to the amount of 10,000 kilowatt hours per day, at and for the price paid by The Colorado Springs Electric Company, for the purpose of operating the electric light plant hereinabove mentioned, for the purposes mentioned, and ordering and directing said defendant to deliver such power to plaintiff at said time, or at any time thereafter that plaintiff may be ready to receive it, at and for the price aforesaid."

The Colorado Springs Electric Company was permitted to intervene. Its contract with the defendant, was not made until several years after the date of the Jackson franchise, and was made with knowledge, and in the light of that ordinance. Not only is the franchise referred to in that contract, but it is a singular and unusual fact that the parties to the contract specifically state therein their disagreement as to the construction to be placed on section 9, now in controversy, though in this case, they appear to be in entire harmony in that particular.

This full knowledge of the terms of the Jackson franchise and the difference in the matter of its construction, is clear from the reading of paragraph eleven of the contract between the defendant and the intervenor as follows:

"11. It is understood and agreed that this contract is in no wise to be considered as a waiver by the Power Company of any of its rights under the said franchise granted to George W. Jackson by the City of

Colorado Springs, and that the power company may, at any time during the life hereof, and at any time after it shall be in position to furnish the lights and power herein referred to, demand of the City of Colorado Springs that it permit the Power Company to furnish to the City of Colorado Springs, and that the city purchase from the Power Company, the lights and power provided for, in and upon the terms and conditions mentioned in section 9 of the said Jackson franchise for the remainder of the term of said franchise; and it is agreed that, when the said City of Colorado Springs, voluntarily or involuntarily, permits the Power Company to furnish the lights and power as provided in section 9 of said Jackson franchise, for the remainder of the term thereof, the Electric Company shall assume and perform all of the obligations imposed by the said section, so far as such obligations relate to the supply of lights and power, using its own distributing system for that purpose, upon receiving an assignment from the Power Company, in due form, of all its rights under the said section, which assignment the Power Company agrees to make; but The Electric Company shall in no way assume any of the obligations of the Power Company to construct any works or plants for carrying out the provisions of such contract, or to turn over to the City of Colorado Springs any works or plants used for performing such obligations; it being understood between the parties hereto that the Electric Company shall assume the obligations as to supplying light and power of said section 9 of the Jackson franchise when accepted for the remainder of the term thereof by the city, as above provided, whether such acceptance on the part of the city is voluntarily granted, and the obligations of the city voluntarily recognized, or

in any manner voluntarily enforced, inasmuch as the Power Company is by its counsel advised, and now believes, that the said section 9 of said Jackson franchise of itself, and in connection with the other sections thereof, constitutes a binding contract obligating the City of Colorado Springs to purchase its street lights upon the terms and conditions therein mentioned, when and as soon as the power company shall be in a position, and the water power shall have been sufficiently developed, to furnish said lights, while the Electric Company is advised by counsel and believes that neither said section of itself, or in connection with the other sections of said franchise constitutes a binding contract, but is merely an option on the part of the City of Colorado Springs. The provisions of this paragraph are understood by the parties, and are to be construed as in no way conflicting with or abrogating or modifying the obligations of either part under other parts of this agreement.''

It will be seen from this, that while counsel for the intervenor contends strenuously here, having reference to the arc lights, and the stipulated price to be paid therefor. ''The city has expressly bound itself to take and use these lights, we desire most earnestly that if we are mistaken in this position, then we insist that regardless of there being an express contract, binding upon the city, there is, nevertheless, an obligation upon the city to take and pay for these lights, which is necessarily implied.'' Yet at the time of the contract it viewed the matter in an entirely different light, for it there said, as to section 9, and other sections of the franchise: ''While the Electric Company is advised by counsel and believes that neither said section of itself, or in connection with the other sections of said franchise constitute a binding

contract, but is merely an option on the part of the city of Colorado Springs.''

The contract then, between the intervenor and the defendant was made with full knowledge of the rights of the city under the franchise, and was clearly subject to any and all such rights.

Specifically, the demand of the city in this case is for power which it claims under section 9 of the franchise to the extent of 10,000 kilowatt hours per day, and at the price paid by the Colorado Springs Electric Company, as the most favored customer of the power company, for the purpose of operating an electric light plant, to be used for lighting the streets, alleys, parks and other public grounds, and the buildings of said city, and also whereby such power shall be sold to and distributed among the inhabitants of said city, to be used in lighting their residences, grounds and places of business. This it claims under that part of section 9, as follows:

''And will at all times during the terms of this grant furnish to the said city such other power as may be required for municipal purposes, at the same prices that are paid by the most favored customer of the said George W. Jackson, his associates or assigns, *provided*, the said city give the said George W. Jackson, his associates or assigns, ninety days' notice of its intention to use any of said power in excess of fifty horse power, and the amount required.''

The contention of the defendant and intervenor against this is: (a) That the purpose for which the power is demanded is not a municipal purpose within the meaning of section 9 of said Jackson franchise.

(b) That such purpose and demand of the city is not within the contemplation of section 9 of said

Jackson franchise or any part thereof, and for said city to take power for said purpose is and would be in contravention of that part of section 9 of the said Jackson franchise in which as claimed by defendant said city contracts with George W. Jackson, his associates or assigns, to take from him or them all arc lights that may be required by said city for the purpose of lighting its streets, alleys and public grounds at the rate of Five Dollars and fifty cents per light per month, and the provisions of said section 9 under which the defendant has the right to furnish such arc and incandescent lights as may be required by the said city for the lighting of the buildings belonging to said city; and because the operation of such a plant, for such a purpose would contravene the provisions of section 9 and the contract and privileges which defendant enjoys thereunder, and constitute an impairment of the obligation of contracts.

(c)   Because, under said section 9, and the facts therein set out, it is not the duty of defendant to furnish power to the plaintiff, unless the plaintiff will agree to take the same minimum amount of power as is taken by the Colorado Springs Electric Company, to-wit: $64,000 worth per annum, by virtue of which agreement defendant claims the prices named in the said contract between the defendant and The Colorado Springs Electric Company were fixed.''

The District Court sustained the contentions of defendant Power Company, and dismissed the action. Clearly under the language of the agreement, to-wit: ''And will at all times during the term of this grant furnish to the said city such other power as may be required for municipal purposes at the same prices that are paid by the most favored customer of the said George W.

Jackson his associates or assigns, provided, the said city give the said George W. Jackson, his associates or assigns , ninety days' notice of its intention to use any of said power in excess of fifty horse power, and the amount required," the obligation to furnish power is limited only by the term "for municipal purposes." If the purpose for which the power is demanded is a municipal purpose, the city is within its right in making such a demand, unless such right is clearly negatived by some other provision of the franchise.

It will be noticed that the power company was to furnish fifty horse power to the city for municipal purposes, without price, and without notice, and the fact that ninety days notice was agreed upon in case of demand of such other and additional power, would seem to contemplate a large amount of power, and the consequent time for preparation for its delivery.

The grant of the Jackson franchise was for a public purpose, and was so construed by Judge Sanborn in 105 Fed., *supra,* for, as was said in that opinion, a grant for a private purpose is one from which neither the city nor its citizens derive any consideration or benefit. It is apparent that the grant in this case does involve consideration and benefit to the city and its citizens. Its purpose was the improvement of its water works and lighting systems. To sustain his conclusion, Judge Sanborn quotes from page 1144 3 Mills, Ann. Stat., as follows:

"They (city councils) shall have power to purchase or erect water works or electric light works; or to authorize the erection of the same by others; but no such works shall be erected or authorized until a majority of the voters of the city or town, who are taxpayers under the law, voting on the question at a general or special election, by vote approve the same."

The court in that case said: "The purpose of the city in making the contract of September 8, 1898, was to enlarge its waterworks, to increase its supply of

water, and to furnish itself and its inhabitants with electric light."

The defendant power company, contends and the lower court held, that the words "municipal purposes" as used in the franchise should be interpreted as meaning "governmental functions." But this contention was distinctly denied in the opinion in that case, for it was said:

"Another position urged by counsel for the appellee is that the system of water works of this city, its streets, parks, and public grounds, are held by the municipality in its political or governmental, and not in its proprietary or business capacity; that consequently, they cannot be diverted from municipal uses, and a city council cannot make any agreement or contract relative to them which a succeeding council may not freely annul. The proposition is not novel. It has received the careful consideration of this court, and, so far as the question it presents is material to the issues in this case, it is no longer open to debate here. In *Ill. Trust & Savings Bank v. City of Arkansas City*, 76 Fed. 271, 282, 22 C. C. A. 171, 181, 40 U. S. App. 257, 276, 34 L. R. A. 518, 525, this court announced its conclusion in these words: 'A city has two classes of powers,—the one legislative, public, governmental, in the exercise of which it is a sovereignty, and governs its people, the other, proprietary, quasi private, conferred upon it, not for the purpose of governing its people, but for the private advantage of the inhabitants of the city, and of the city itself, as a legal personality. In the exercise of the powers of the former class it is governed by the rule here invoked. In their exercise it is ruling its people, and is bound to transmit its powers of government to its successive sets of officers unimpaired. But in the exercise of the powers of the latter class it is controlled by no such rule, because it is acting and contracting for the private benefit of itself and its inhabitants, and it may exercise the business powers conferred upon it in the same way, and in their exercise it is to be governed by the same rules that govern

a private individual or corporation. Dill. Mun. Corp. (3rd Ed.) § 66, and cases cited in the note;—*Safety Insulated Wire and Cable Co. v. City of Baltimore,* 13 C. C. A. 375, 377, 378, 66 Fed. 140, 143, 144; *San Francisco Gas Co. v. City of San Francisco,* 9 Cal. 453, 468, 469; *Com. v. City of Philadelphia,* 132 Pa. 288, 19 Atl. 136; *New Orleans Gaslight Co. v. City of New Orleans,* 42 La. Ann. 188, 192, 7 South, 559, 560; *Tacoma Hotel Co. v. Tacoma Light & Water Co.,* 3 Wash. St. 316, 325, 28 Pac. 516, 519, 14 L. R. A. 669 [28 Am. St. Rep. 56]; *Wagner v. City of Rock Island,* 146 Ill. 139, 154, 155, 34 N. E. 545, 548, 549, 21 L. R. A. 519; *City of Vincennes v. Citizens' Gaslight Co.,* 132 Ind. 114, 126, 31 N. E. 573, 577, 16 L. R. A. 485; *City of Indianapolis v. Indianapolis Gaslight & Coke Co.,* 66 Ind. 396, 403; *Read v. Atlantic City,* 49 N. J. Law, 558, 562, 9 Atl. 759. In contracting for water works to supply itself and its inhabitants with water, the city is not exercising its governmental or legislative powers, but its business or proprietary powers. The purpose of such contract is not to govern its inhabitants, but to obtain a private benefit for the city itself, and its denizens. 1. Dill. Mun Corp. § 27; *City of Cincinnati v. Cameron,* 33 Ohio St. 336, 367; *Safety Insulated Wire & Cable Co. v. City of Baltimore, supra,* and cases cited under it.''

The many definitions and citations presented by the appellee are not inconsistent with this conclusion. The mere fact that a municipal corporation may possess the two separate and distinct powers, the one termed governmental or public, and the other private, corporate or ministerial, does not detract from the conclusion that all such powers are alike municipal, for both are delegated powers to be used, for the use and benefit of the municipality and its inhabitants. Counsel for defendant relies on *San Francisco v. Spring Valley Water Works,* 48 Cal. 493, to sustain its contention. But that case simply determines that a private corporation authorized to furnish water for the city was not thus endowed with municipal powers, that such a corporation must be organized under the gen-

eral laws of the state, and it is not within the constitutional power of the legislature to confer municipal powers upon a private corporation.

While functions of the municipality, such as the erection and maintenance of public utilities, are not governmental in their nature, yet they are strictly municipal purposes, that is to say they are intended specially and peculiarly to promote the comfort, convenience, safety and happiness of the citizens of the municipality, though perhaps not essential to the welfare of the general public.  28 Cyc. 268.

Hence, in the light of these authorities it cannot be said that in the granting of the franchise, the city did not, and did not intend to provide for power for all municipal purposes.  To so hold is to impute to the city counsel either ignorance, or bad faith with its people. The practice of the courts in referring to this class of municipal purposes other than governmental, as private, has had a tendency to confuse, in as much as those cannot be said to be in any sense private, as that term is commonly understood.  The purpose is essentially a public one, and for the general good of all the inhabitants, the support of which is provided for by a public tax, levied upon all the citizens and property of the city.

The very fact that the legislature has conferred the power upon cities to erect and maintain gas and electric light plants, water works, etc., to supply its citizens, to be paid for from taxes to be levied upon the inhabitants, is sufficient determination of the municipal purpose and character of these utilities.  The power of the legislature to do this is not questioned in this case, and is universally recognized by the courts.  *Jacksonville Electric Light Co. v. Jacksonville,* 36 Fla. 229, 18 So. 677, 30 L. R. A. 540, 51 Am. St. 24.

Judge Elliott in his recent work on Municipal Corporations has stated as the rule; ''The erection of an electric light plant to supply a city with light for use in the streets and public places, and in the homes and places of business of the inhabitants, is a municipal pur-

pose for which bonds may be issued and taxation authorized.''

The language of the franchise is that the grantee will at all times furnish to the said city such other power as may be required for municipal purposes, at the same prices that are paid by the most favored customer of the said George W. Jackson, his associates or assigns, with the provision only that the city shall give ninety days notice of its intention to use any of such power and of the amount required.

There is nothing in the language of the franchise or the extent of its purpose that would indicate a different intent of the parties than the exact language conveys, or as the city contends, nor does it appear to be unreasonable.

The franchise is purely one for the generation of electric power. It does not purport to grant the right or privilege of erecting or maintaining an electric light plant, or of supplying lights to the inhabitants, or of using the streets and alleys for such purpose. Neither does it appear that Jackson or his assigns have otherwise construed the franchise, by the erection of a light plant, or by furnishing electric light to the citizens or even for street purposes, for the latter were supplied by the Electric Company to whom Jackson and his assigns sold power.

The generation and sale of electric power is the sole business in which Jackson and the defendant, his assignee, has been engaged. This power has been sold, not only to the intervenor, but to other cities, and to industrial companies. Then why is it not entirely reasonable to conclude that as one of the considerations of the granting of so valuable a franchise, the city should reserve to itself the right to purchase the power it might at any time require, upon the same terms as the most favored customer of the owners of the power plant, to be so erected, under and by virtue of the franchise. Aside from this the city was to receive comparatively little for the franchise granted. It was to receive such arc lights

of indicated power, as it might require at the stipulated price of $5.50 per month. But it does not appear that this was not the reasonable or adequate value for such service. The only free service that the city might receive under the franchise was five arc lights of 2000 candle power each, not more than 200 incandescent lights of 16 candle power each, and the maximum of 50 horse power if required. Certainly this was small consideration for so valuable a grant, and it may well be concluded that the city had in view the very purpose which it now contemplates, supplying its own citizens with light, by means of its own lighting plant. Indeed, it is not conceivable that the city could use any considerable amount of power for any other purpose, within the scope of its municipal power, as then and now understood.

The second proposition of the Power Company is that the demand of the city, in so far as it relates to power to be used for lighting the streets, is a direct impairment of the obligation of the contract wherein it is provided that "Jackson and assigns shall within one year from the completion of the Strickler tunnel, and during the remainder of the term of the grant, furnish to the City of Colorado Springs, such arc lights, of standard 2000 candle power, each, as may be required by said city for the purpose of lighting its streets, alleys and public grounds at the rate of five dollars and fifty cents ($5.50) per light per month, said lights to be used from sunset to sunrise during each and every day of every month."

The argument of counsel is based upon the assumption that the city agreed to take these lights and at such price for the full term of the grant. There is no such express agreement, for the only stated provision is that Jackson shall furnish the lights, and not that the city shall take and use them for any period whatsoever, or at all. But if the contract did so provide, then there is nothing in the grant to prevent the city from constructing its own plant, and furnishing light to its inhabitants, and to serve the city's other purposes,

The contract refers to no other lights, for which the city was to pay, than its requirements for arc lights, of the power and at the price named. The only express agreement upon the part of either party in this respect was that Jackson shall furnish such arc lights as may be required by the city. We do not find any authority to sustain the contention of appellee that the city may be bound by implication or otherwise than by express agreement. That an obligation of the public in such a case be expressly stated, and will not be implied, is settled by the Supreme Court of the United States in *Helena Water Works Company v. Helena,* 195 U. S. 383, 49 L. Ed. 245, 25 Sup. Ct. 40. That was a case where the water works company had contracted to supply the city and its inhabitants with water for a period of twenty years. At the time of the agreement the city council made an appropriation covering the price of the water for the city's purposes for five years of that period. It was conceded by the court for the purposes of that case only, that the effect of such appropriation by the city, was that of an agreement to pay the agreed price for the period of five years, but the contention of the company that the city was bound by implication for the full period of the franchise was denied. Upon that question the court said:

"Properly construed, we think this ordinance shows an agreement upon the part of the company to furnish water to the inhabitants of the city at not exceeding certain maximum rates, and to the city itself, upon terms to be agreed upon, made definite, as far as the city was concerned, for the term of five years. As thus interpreted we do not find anything in this contract that prevents the city, certainly after the expiration of five years, from constructing its own plant. It has not specifically bound itself not so to do, and, as has been frequently held in this court, nothing is to be taken against the public by implication. *Hamilton Gaslight & Coke Co. v. Hamilton,* this court, nothing is to be taken against the public by implication. *Hamilton Gaslight & Coke Co. v. Hamilton,* 146 U. S. 258, 36 L. Ed. 963, 13 Sup. Ct. Rep. 90; *Long Island*

*Water Supply Co. v. Brooklyn,* 166 U. S. 685, 41 L. Ed. 1165, 17 Sup. Ct. Rep. 718, and cases cited in the opinion. Had it been intended to exclude the city from exercising the privilege of establishing its own plant, such purpose could have been expressed by apt words, as was the case in *Walla Walla v. Walla Walla Water Co.,* 172 U. S. 1, 43 L. Ed. 341, 19 Sup. Ct. Rep. 77. It is doubtless true that the erection of such a plant by the city will render the property of the water company less valuable, and perhaps unprofitable; but if it was intended to prevent such competition, a right to do so should not have been left to argument or implication, but made certain by the terms of the contract."

Counsel for defendant cite *Minn. Lumber Co. v. Whitehurst,* 160 Ill. 85, 31 L. R. A. 529, 43 N. E. 774; *Leadville Gas Co. v. Leadville,* 9 Colo. App. 400, 49 Pac. 268; and *Golden Cycle Mining Co. v. Rapson Coal Co.,* 188 Fed. 179, 112 C. C. A. 95, and sustaining its contention that because of the agreement upon the part of Jackson to furnish the city such arc lights "as may be required by the city" during the life of the franchise, the city is for that reason impliedly bound to take such lights at the price named for such full term of the franchise.

These cases, with the exception of the Leadville case, all involved private and not public contracts. The present case involves a public contract, and the city has not specifically bound itself to take such lights for any period whatsoever, and as said in *Helena Water Works Co. v. Helena, supra,* "nothing is to be taken against the public by implication." But the cases relied on do not sustain the contention of the Power Company. In *Minnesota Lumber Co. v. Whitehurst Coal Co.,* as was said by the court, "appellant *had agreed to buy,* and *appellee had agreed to sell* and deliver, all coal which would be needed for the season." The dispute in that case was as to the construction of the word "require" as used in the agreement.

*Leadville Gas Co. v. Leadville, supra,* was an action for recovery of the price of gas had and received by the city under its contract. The contention of the city was that the contract was invalid because no prior appropriation had been made by the city council to cover the expense, under the provision of sec. 4449 Mills. Ann. Stat.

In *Golden Cycle Mining Co. v. Rapson Coal Mining Co., supra,* it was expressly agreed that "*the mining company agrees* to buy from the coal company all the coal it may use, etc., for the period, and *the coal company agrees to supply and deliver* all such coal, etc." This was an express agreement upon the part of both parties, which is not found in the franchise under consideration. In our opinion the contract neither placed obligation on the city to take from Jackson any light at all, nor limited its rights and privileges in that respect in any manner whatsoever, even admitting for the sake of the argument that the city had power so to do, which is not necessary to determine here.

The contract is entirely silent as affects any such obligation on the part of the city, and if it was the intention of the parties that the city should be so obligated, the contract should have so stated, rather than that courts be asked to insert it into the agreement. Indeed, section 9 of the franchise in so far as it effects the city, can be construed only as an option to purchase, as it relates both to arc lights and to power, wherein the price at which such purchase may be made, is definitely stated as to the former, and certainly determinable as to the latter, under the terms of the agreement. The valuable grant to Jackson is a sufficient and valuable consideration for such option.

The third contention of the defendant company is that it is not its duty to furnish the power demanded by the city, unless plaintiff will agree to take the same minimum amount of power contracted for by the Colorado Springs Electric Company, or a minimum of about $64000 per annum.

This seems to admit the unsoundness of the claims of defendant heretofore discussed, for if the city was not entitled to any such power as claimed, clearly it was not entitled to or required to demand power to the extent of $64000 in value per annum. But there is nothing in the agreement by which such claim of defendant can justly be inferred, or even suspected. The agreement is that the holder of the franchise will at all times during the term of the grant "furnish to the city such other power as may be required for municipal purposes." Plainly, this must mean much or little, dependent upon the requirement for the specific purpose. It is not within the province of the court to rewrite the agreement for the parties. Much is said in the briefs as to the construction of the word "required." We do not find it important or necessary to enter into any nice distinctions in that regard in this case, or to even discuss it, in view of our conclusions above stated. There can be no other conclusion in either of the instances in which the word is used in section 9 of the franchise, whether relating to arc lights or power, than that it refers to that which may be necessary for the purposes specified.

It is agreed in the briefs that the Colorado Springs Electric Company is the most favored customer of the defendant. The price then fixed in defendant's agreement with that company should govern. This then, under the terms of the franchise is the price at which the city is entitled to receive the power demanded in this case.

Counsel for defendant in error makes an ingenious argument to show that this price is augmented and the price to the city made undeterminable by other provisions contained in the contract with the Electric Company; (a) the amount to be consumed by the Electric Company, minimum and maximum; (b) the question of competition avoided under the agreement between the Electric company and the Power company; (c) the fact that the Electric Company was to furnish transmission

lines from Manitou to Colorado Springs, and (d) possible transformer and transmission losses.

The last two of these propositions can in no event be considered for in the agreed statement, the claim of the city is for the right to demand and receive from the Power Company, and at the price paid by the Electric Company under its said contract, the amount of power claimed, "to be measured and delivered to plaintiff at the same places where power is measured and delivered" to the Electric company. And it is provided in the contract between the two companies that all power supplied thereunder shall be delivered at the eastern limit of the city of Manitou, to transmission lines to be furnished by the Electric company.

The place of delivery to the city must therefore be held to be at such eastern limit of the city of Manitou and hence the question of the cost of transmission lines and losses in transmission from such point to the city of Colorado Springs is not involved.

The price was to be that agreed upon between the Power company and its most favored customer, and this is admitted to be the Electric company.

The term price cannot be said to include anything but the rate fixed by the contract for the sale of the commodity. The price under the terms of paragraph seven, of the contract between the Power company and the Electric light company, and which paragraph must be controlling in the fixing of price to be paid by the city of Colorado Springs, was to be 5.85 mills per kilowatt hour, when the monthly consumption does not exceed one million kilowatt hours, and when the average daily load factor for the calendar month is from fifty to fifty-seven per cent.

But when the said load factor is less than fifty per cent, the rate per kilowatt hour is to be increased .05 of a mill for each per cent of such decrease of load factor, down to forty-five per cent, but no decrease of load factor was to be considered below forty-five per cent in fixing the rate. Therefore the rate for less than forty-five

per cent would be 5.85 mills, added to .25 mills for the five per cent decrease in load factor, or 6.10 mills per kilowatt hour.

The amount demanded by the city is much less than one million kilowatt hours per month, and if the load factor is forty-five per cent or less, the price to the city under the said paragraph in the agreement, for the amount so demanded, must be 6.10 mills per kilowatt hour.

If, however, the said load factor shall exceed forty-five per cent, then the rate must be reduced according to the schedule contained in the said contract between the electric company and the power company.

This was the agreed price at which the power was to be sold and purchased in the contract with the most favored customer, and the city cannot be hampered by other. and different contract agreements, which may or may not have had influence in fixing that price. It is the price fixed for the sale of the commodity that is to govern.

Finally defendant contends that it does not appear in the agreed statement that there has been a vote of the qualified electors, of the city authorizing the construction of and maintenance of an electric light plant, as required by the statute, and therefore the city may not demand the power to be used for that purpose.

This is not a question that defendant can raise in this case. It does not involve the right or power of the city to erect and maintain an electric light plant for the purposes asserted, nor to levy taxes therefor. It is simply a question of procedure provided by the statute in such case, and the court cannot presume that the city has not, or will not, proceed in accordance with the requirements of the statutes.

The judgment of the district court is reversed with instruction to that court to enter judgment for the city in accordance with the prayer of its complaint, and the views herein expressed.

*En banc.*

WHITE, J. and GARRIGUES, J. dissent.

BAILEY, J., agrees to the construction given the contract, but dissents upon the record before the court, upon the proposition of fixing the rate at which the city is to be furnished current.